In the Matter of the Estate of SAMUEL SCHLOSSMAN, Deceased.

Surrogate's Court, Bronx County, March 5, 1930.

*Oudin, Kilbreth & Schackno* [*Henry G. Schackno* of counsel], for the administratrix.

*Kremer & Leavitt* [*Samuel Leavitt* of counsel], for Pauline Kahn, objectant.

*John P. Cohalan,* for Abraham Schlossman, objectant.

SCHULZ, S. As the result of an application to compel an accounting, this account and a petition for its judicial settlement were filed.

The persons interested in this estate are the decedent's wife and eight children. Of these, Pauline Kahn, a daughter, and Abraham Schlossman, a son, filed answers containing objections. Upon the hearing, some of these objections were stricken out on motion, and others were withdrawn. Subsequently it was stipulated that the objections filed by the contestants should be considered as being the objections of another son, Louis Schlossman, and that the objections filed by each contestant should also inure to the benefit of the other contestants.

The objections contained in the two answers were, in many instances, the same in substance. Upon the hearing, those filed by Pauline Kahn were taken up first, and then such as were contained in the other answer and not already covered, were tried. The same procedure will be followed in determining them.

In the course of the hearing the court reserved its decision upon some motions to strike out. They are disposed of as follows:

The motions made at the end of the hearing to strike out the testimony and exhibits offered by the contestants that deal with the business of the corporation after May 15, 1927, when it is alleged to have been sold, are granted to the extent of striking out so much thereof as refers to the business after that date, except as to such evidence and exhibits as were admitted without objection.

The motion to strike out exhibits which appears at page 1598 of the record is denied.

The statement in contestants' brief that they consent to strike out some of the exhibits in whole or in part, cannot be given effect as this was not entered upon the record and is not consented to by the administratrix.

The testimony of Emanuel Schlossman as to conversations with the decedent relative to the lease of the premises 415–417 West Forty-second street, at the time the financial statement (Contestants' Exhibit 18) was prepared, was properly received. While it tended to show ownership thereof to be in the alleged corporation of which the witness claimed to be a stockholder and not in the estate of the decedent, the financial statement which contained an

item relating to such lease had theretofore been offered in evidence by the contestants who examined the witness relative thereto. As a result, the prohibition of section 347 of the Civil Practice Act was lifted as to the matter referred to. (*Kings County Trust Co.* v. *Hyams*, 242 N. Y. 405, 412; *Nay* v. *Curley*, 113 id. 575, 578; *Clark* v. *Dada*, 183 App. Div. 253, 263; *Cole* v. *Sweet*, 187 N. Y. 488; *Merritt* v. *Campbell*, 79 id. 625.) The motion to strike out such testimony, upon which decision was reserved, is denied.

The motion to strike out the testimony of Saul Schlossman as to conversations had with the decedent relative to meetings of the board of directors, and as to such meetings at which the decedent was present, is granted. It involved a personal transaction with the decedent (*Griswold* v. *Hari*, 205 N. Y. 384, 395) and the witness was incompetent to testify. (Civ. Prac. Act, § 347.)

All other motions made to strike out evidence or exhibits, upon which decision was reserved, are denied.

Exceptions are awarded on each of the foregoing rulings to counsel to whom they are adverse.

The contention is made that the contestants are bound by the testimony of the witness Gammerman. He was the bookkeeper of the business conducted under the name of Samuel Schlossman & Sons, Inc., and had charge of the financial records of the same both before and after the death of the decedent, and kept the accounts of his estate since his death. The contestants had the right to cross-examine the administratrix, but this would have been futile for it is very evident from her testimony that she knew little, if anything, about the accounts. The witness Gammerman was produced as the one having knowledge of the matter and upon whose knowledge the account was presumably prepared. I hold that the contestants had a right to cross-examine him as to the account with the same effect as though they cross-examined the administratrix, and were not bound by his testimony; otherwise, the right given contestants under section 263 of the Surrogate's Court Act could be abridged or absolutely defeated if the legal representative had no personal knowledge of the items contained in the account.

As to the ring, no evidence of ownership by the husband was produced, except that the setting was changed and that he had on occasions worn it. The burden of establishing that the assets accounted for were not all of the assets of the decedent, is upon the contestant. (*Matter of Rogers*, 153 N. Y. 316, 328; *Matter of Mullon*, 145 id. 98, 104; *Matter of Murtha*, 130 Misc. 330; *Matter of Hunter*, 170 App. Div. 934; *Matter of Baker*, 42 id. 370.) This

burden has not been sustained with respect to the ring, and the objection is, therefore, dismissed to that extent.

Under the objection that the administratrix has not accounted for all of the assets of the estate, my attention has been called to various alleged omissions which are disposed of as follows:

It appears that the furniture referred to was obtained from the business and the decedent charged therewith at his request, within a few months before the date of his death, and there is no evidence of any change in the ownership thereof. If they were a gift to the administratrix, the burden of showing this was upon her. (*Matter of Housman,* 224 N. Y. 525; *Matter of Canfield,* 176 App. Div. 554; *Matter of Brown,* 86 Misc. 187; affd., 167 App. Div. 912; affd., 217 N. Y. 621.) As it appears that the same is still in the possession of the accountant, she will be charged therewith and required to account therefor in her final accounting. .

As to the payment of the sum of $3,208.83 to one Druckman, the evidence shows that the loan was made to the decedent upon his notes and hence his estate was liable. The evidence was insufficient to warrant a finding that the proceeds of the notes were loaned to his son Harry; hence no surcharge can be made therefor. (Cases cited above; also *Matter of Sprague,* 40 App. Div. 615; affd., 162 N. Y. 611.)

Nothing has been shown which would warrant charging the administratrix with bank interest received by her other than that accounted for. The item of $4,830.97, referred to as appearing on contestants' Exhibit 104, is listed as an asset, and not as a liability.

An attempt is made to surcharge the petitioner by reason of the reduction of the rents of the premises 538–542 Ninth avenue from the sum of $800 per month to the sum of $500 per month. While it is true that the administratrix representing at least a majority ownership in the business, could have determined to remain in the premises, it seems quite clear that before the decedent's death a removal had been contemplated, and by insisting upon the business remaining in the premises, she might have been properly subject to criticism. The rent which it was possible to obtain from other tenants, subsequent to the removal of the business, is indicative of the fact that the rent as reduced was not below the fair rental value of the premises in the condition in which they then were.

The alterations made to premises 583 Ninth avenue were contracted for prior to the death of the decedent and one-half of the cost thereof was properly paid by the administratrix and credited to her in the account. It was not shown that such payments were improperly made or that they were exorbitant or contrary to the agreements entered into.

While no specific objection has been made to the adequacy of the rental paid for November and December, 1925, by the alleged corporation to the lessees of the Daniels lease, both counsel have discussed it and I have considered it, and under the circumstances which existed at the time when possession was taken, the rental appears to me to have been adequate.

The uncontradicted testimony is to the effect that the children of the decedent agreed that the administratrix should collect the rents and take care of the real estate. She did in fact pursuant to said agreement, either personally or through her agent, exercise supervision over the realty and collect the rents, and she has included the same in her accounting without objection. Under these circumstances, I reach the same conclusion as I did in *Matter of Ellinger* (120 Misc. 276, 278), namely, that she is entitled to commissions thereon.

At the time of the death of the decedent, a furniture business in which he and some members of his family were active, was being conducted at 538–542 Ninth avenue in the city of New York. One of the questions presented is whether a corporation existed which owned and conducted this business or whether it was the property of the decedent solely and individually.

It appears that on the 21st day of January, 1921, the decedent caused to be filed in the office of the Secretary of the State of New York, a certificate of incorporation, a copy of which is in evidence, of a corporation to be known as "Sam'l. Schlossman & Sons, Inc.," and a few days thereafter a duplicate original thereof was filed in the office of the county clerk of New York county. The capital stock was stated to be $15,000, the number of shares 150 and the par value of each share $100. It provided that the directors should be three in number and need not be stockholders. On January 1, 1922, a statement was made and delivered to the Manhattan Trust Company upon a letterhead bearing the imprint "Sam'l. Schlossman & Sons, Inc.," purporting to show the financial condition on December 31, 1921, and was signed by the decedent as president and treasurer. On the 5th day of February, 1923, a bank account was opened with the Chatham Phenix National Bank and Trust Company in the name of "Sam'l. Schlossman & Sons, Inc.," and the signature card was signed "S. Schlossman, President" and "Emanuel Schlossman, Vice President." Under date of June 15, 1923, and November 25, 1924, the decedent submitted personal bank statements to a bank in both of which he states that he has an interest in "Sam'l. Schlossman & Sons, Inc." and in one of which he states that he is the president thereof. On June 20, 1923, and on November 25, 1924, statements were made

to the bank in the corporate name for the purpose of obtaining credit, and while these were not signed by the decedent, they show that the business was being conducted as a corporation and that the bank at least dealt with the concern as a corporation.

These statements although signed only by Emanuel Schlossman as vice-president are worthy of consideration in view of the fact that they were made *ante litem motam* and while the deceased was still living.

An income tax return for the year 1923 was filed in the name of the corporation and was signed and verified by Samuel Schlossman as president and treasurer and Emanuel Schlossman as vice-president. A similar return for the year 1924 was filed, signed by Samuel Schlossman as president, and Emanuel Schlossman as vice-president, and contained a recital in Schedule C to the effect that Samuel Schlossman was the president and Emanuel Schlossman was the vice-president of the corporation. A lease of premises known as 415–417 West Forty-second street, known as the Kieger lease, was entered into in the name of the corporation on May 1, 1924, and was signed and sealed on the part of the corporation by Samuel Schlossman who was described therein and acknowledged the same as its president. On January 8, 1925, the decedent signed a document (Accountants' Exhibit 41) in which he agreed that the stock of the corporation be distributed in a certain manner.

Upon this evidence I am satisfied that the decedent intended to incorporate his business, and that he believed that he had accomplished this purpose and was conducting his business as a corporation.

There is, however, no competent evidence that prior to the death of the decedent, any organization, stockholders' or directors' meetings were held; and it was not shown that before that time minutes were recorded, notice of meetings given, by-laws adopted or corporate stock certificate and transfer books kept, nor that any certificates of stock were issued or delivered.

The decedent had, for many years, owned and conducted a furniture business. No one else was interested in it and he had a right to do with it as he pleased.

Although it would appear from the certificate of incorporation that three other persons were the incorporators, each of whom had subscribed to one share of stock, and that they were to be the directors for the first year, it is quite evident that they acted simply for purposes of incorporation and that whatever ownership or authority they had ceased long before January 8, 1925, the date when the instrument heretofore referred to was signed.

If we consider the evidence to which I have alluded above, it

appears that the only other persons interested in the corporation, if it existed, were members of the decedent's family; such being the case, the laxity and informality which characterized the conduct of its affairs may be understood.

The question is, can the intent of the decedent to incorporate and to conduct his business as a corporation be given effect, at least between the parties, where no rights of creditors are involved, and no question of public policy arises.

Whatever the situation might be held to be as to third parties, with regard to the decedent and the other alleged interested parties, the presumption is warranted that proper meetings, though perhaps informal in character, were held, that the proper steps were taken to transfer the business of the decedent to the corporation, and that the business was in fact functioning as a corporation.

I, therefore, hold that a corporation existed, that the assets of the business conducted as aforesaid, were its property, and that the same were not the property of the decedent individually.

The percentage of ownership claimed by others than the decedent, it is urged, is evidenced by a document signed by the decedent dated January 8, 1925, in which he states that in consideration of the sum of $100 and other valuable considerations and to compensate his son Emanuel for services previously rendered, he agreed that the stock of Samuel Schlossman & Sons, Inc., shall be distributed as follows: Fifty-one per cent to himself, Samuel Schlossman; five per cent to his wife, Annie Schlossman; five per cent to a son, Saul Schlossman, and thirty-nine per cent to Emanuel Schlossman. One original of this instrument was left by the decedent with his attorney who had the stock certificate book, and a duplicate original was given to his son, Emanuel Schlossman. Prior to that time, in his personal statements to the bank heretofore referred to, he stated that his interest in the corporation amounted to fifty-one per cent thereof, clearly indicating that at the times they were drawn he had already given or decided to give forty-nine per cent thereof to others. No certificates of stock were actually issued until after the death of the decedent.

The burden of showing that the decedent owned more than fifty-one per cent of the corporation was upon the contestants and was not sustained.

Upon this evidence, I hold that the interests of the respective parties in the corporation were the percentages stated, and that these interests existed even though no certificates of stock were issued and delivered. Such certificates would be simply evidence of the interests of the parties in the corporation.

If, however, I am wrong in my conclusion, and the intent to form

a corporation and to carry on the business as a corporation cannot be given effect because of some technical omission in its creation, or in the conduct of its affairs, nevertheless am I of the opinion that the parties would have the percentages of ownership in the business and its assets which the paper heretofore referred to set forth, and that if the business was in the control and possession of the decedent, he was holding the same as trustee for the persons to whom he had directed distribution of forty-nine per cent thereof, as heretofore stated, to the extent of their respective interests. (*Matter of Brown*, 252 N. Y. 366.)

It appears that the sum of $9,000 of the profit realized upon the sale of the Kieger lease was divided between the parties in proportion to the amount of their interest in the corporation and that the estate received its proper share thereof; hence, even though it might have been improper to declare a dividend, as no rights other than those of stockholders were involved, no damage resulted to the estate for which a surcharge should be made against the administratrix. Such an act could be ratified by the stockholders (*Remington & Son Pulp & Paper Co.* v. *Caswell*, 126 App. Div. 142) and must be assumed to have been ratified when they accepted their shares of the amount.

The evidence against the contention that the Kieger lease belonged to the corporation is Exhibit 18, which the witness Emanuel Schlossman explained. His explanation received corroboration in the books of the corporation and the testimony of the witness Gammerman as also in the lease itself (Accountants' Exhibit 44) which shows that it was made to Samuel Schlossman & Sons, Inc., and subscribed with the corporate name by the decedent as president. I hold that the Kieger lease belonged to the corporation as claimed by the administratrix.

The decedent died on May 17, 1925. At that time he was receiving a yearly salary of $5,000 and Emanuel Schlossman was paid $3,000 per year for his services. Neither Saul nor the present administratrix were receiving salaries of any kind. On August 3, 1925, the administratrix and her two sons above named voted themselves the following salaries: The administratrix, the president of the corporation, $2,500; Emanuel Schlossman, vice-president, $15,000; Saul Schlossman, secretary, $2,500, and they credited themselves with these salaries not only from the date when fixed but from the beginning of the year 1925, that is, from a date prior to the death of the decedent.

I am of the opinion that the salary of $3,000 which had been paid to Emanuel Schlossman during the decedent's life was probably less than the services he rendered were worth, and this would find

support in accountants' Exhibit 41. The salary of $15,000 per year, however, I deem too high. I hold that a fair and reasonable sum would be $10,000; that is, an amount equal to the salary theretofore received by the decedent, whose work he was now doing, and the salary he had been receiving, and an additional amount of $2,000. I find no justification for the payment of salaries to the administratrix or to Saul Schlossman.

It follows that the salary which should have been paid by the corporation to Emanuel Schlossman was at the rate of $3,000 per annum from January 1, 1925, to May 17, 1925, and after that at the rate of $10,000 per annum up to the time of the sale of the estate's interest in the corporation, and that no salaries should have been paid to the administratrix nor to Saul Schlossman.

Neither the objection to the amount at which the shares of stock and the lease of the Crucible Realty Company were sold, nor those relating to a mortgage of $5,000 on Long Island property have been pressed. These objections are dismissed.

The testimony is that an attempt was made to open a bank account in the name of the Daniels Hotel, but that the bank declined to take it in that form and so it was opened in the name of Emanuel Schlossman. The money from the Daniels Hotel was deposited partly in the latter account and partly in the account of Samuel Schlossman & Sons, Inc. When the Daniels Hotel required money, it would be drawn from the account of Emanuel Schlossman or from the account of Samuel Schlossman & Sons, Inc., and from time to time checks would be drawn from Samuel Schlossman & Sons, Inc., account and put in the account of Emanuel Schlossman. The latter was the active account of the Daniels Hotel moneys. The accounts of the moneys from the Daniels Hotel should not have been mingled with those of Samuel Schlossman & Sons, Inc. It does not appear, however, that any loss was sustained by reason of that procedure, and hence, no surcharge is made against the administratrix by reason thereof.

The final question to be determined is whether the administratrix sold the assets of the estate for a fair and reasonable amount. These consisted of a one-half interest in a lease, and, if I am correct in the conclusions which I have reached, of a fifty-one per cent interest in the corporation.

The lease contained a statement that the tenants (Samuel Schlossman and Emanuel Schlossman) had deposited with the landlord the sum of $10,000 as security, etc., and the question arose as to whether such deposit was made by the decedent or was made by the latter and his son. As the lease was made to both, and the deposit was made under the lease, it would seem fair to assume that it was

to be regarded as the property of both, as tenants in common, and that the question as to how much each one contributed is not of great importance. The administratrix under examination by the contestants testified that the decedent and his son Emanuel had each deposited $5,000 to this fund; that Emanuel Schlossman only had $1,500 and that the decedent told her that he had made a present of $3,500 to the son.

Upon the evidence I hold that the deposit belonged to the two lessees, regardless of whose money it originally was.

The lease was of the premises known as 401–405 West Forty-second street and 583–585 Ninth avenue; its term was from April 1, 1925, to March 31, 1951. It is dated January 13, 1925, and has been generally referred to throughout as the Daniels lease. One of the buildings mentioned in it was subject to another lease known as the Orr lease whose date of expiration was May 1, 1930.

On May 15, 1927, the accounting administratrix sold the decedent's interest in the Daniels lease, the deposit and the corporation, to her two sons, Emanuel Schlossman and Saul Schlossman. The total price was $25,000, plus the interest which Emanuel Schlossman and Saul Schlossman would have in such sum, to. wit, one-sixth thereof, so that the real sale price was $30,000. The administratrix contends that the leasehold was worth nothing, whereas the contestants claim the contrary, and that she failed to exercise proper diligence in obtaining its fair value.

Before the decedent's death it was intended to remove the business then being conducted at 538–542 Ninth avenue into the buildings included in the Daniels lease, and provision had been made for altering some of these buildings to make them more adaptable for that purpose. After the death of the decedent there was paid for these alterations the sum of $27,131.71, for one-half of which the administratrix claims credit in her account, the other half having been payable by Emanuel Schlossman. The corporation took an assignment of the Orr lease for a consideration therein stated of $2,500, and thereafter the corporation further expended the sum of approximately $14,099.95 to alter the building theretofore covered by the Orr lease and the one next door in order to facilitate their use for the business of the corporation. In other words, after the lease had been made, there was expended out of the estate's funds and by Emanuel Schlossman for the alterations stated, $27,131.71, and by the corporation for a similar purpose $14,099.95, making a total of $41,231.66, and the Orr lease was acquired at an expense to the corporation of $2,500. After all of these expenditures the transfer took place.

The alterations which were made were adequate for the premises

and the location in which the premises were situated. Prior to that time, a cafe and restaurant had occupied the ground floor of at least some of the buildings, and above that level some were devoted to the Daniels Hotel and some to dwelling purposes. The locality in which the business was located was a business neighborhood on the corner of Forty-second street and Ninth avenue. The alterations consisted in adapting the ground floor for business purposes and also in altering the second floor of some of the buildings for like occupancy by putting plate glass fronts into the same, etc.

Whether a lease has any value depends upon whether the rental value is larger than the rent reserve. (*Clarkson* v. *Skidmore*, 46 N. Y. 297; *Larkin* v. *Misland*, 100 id. 212; *Rae Company* v. *Courtney*, 250 id. 271.) Usually, of course, the owner endeavors to obtain the full rental value for his property, but even if he succeeds, changes in the neighborhood or other causes sometimes increase the rental value, and the lease becomes valuable to the extent that the rental value is or becomes greater than the rent reserved in the lease. Such a result may also occur by reasons of changes made in the structures leased, although it does not follow, of course, that all changes have this effect. It might well be that alterations made by a tenant, although advantageous for the conduct of his own business, would actually decrease the rental value for other business purposes appropriate for the neighborhood in which the building is located. Where, however, the alterations are adequate for the neighborhood, and for general business purposes, and the neighborhood is a business section, I think the expenditures for such alterations, while not determinative, may be considered in so far as they tend to throw light upon the rental value at the time of the assignment, for such rental value, in the last analysis, must be largely a matter of approximation.

It is a fair assumption that when the lease was made the terms were fixed having in mind the buildings in the condition in which they then were, the expenses thereafter to be incurred and that one of the buildings was subject to the Orr lease. For that reason, it is quite likely that the rental value was lower then than it was when the assignment was made after the alterations were completed and an assignment of the Orr lease obtained. Although not decisive of the question, it is interesting to note that if the cost of the alterations is amortized, over the entire period of the lease, the result would be as follows:

The term of the lease was twenty-six years, and the total expenditure being $41,231.66, the amount for each year would be $1,585.83. As the lease had run from April 1, 1925, to May 15, 1927, a period of two and one-eighth years, the amount of the

alterations apportionable to that time would be $3,369.89. Deducting this amount from the total cost of the alterations would leave a balance of $37,861.77, and adding to this the $10,000 on deposit, would give the sum total of $47,861.77 as the amount expended plus the deposit made, which would inure to the benefit of the tenant from May 15, 1927, to the end of the lease, so that if the estate had not sold the lease, it would have had the benefit of one-half of the same, to wit, $23,930.88.

Real estate experts were called by each side and interrogated as to the value of the leasehold. Those called by the accounting petitioner testified that the same was of no value other than the amount of the deposit, to wit, $10,000. One of them testified that the part of the premises occupied by the furniture business had a rental value of $22,000, and that the part of the premises occupied by the hotel had a rental value of $10,000, making a total of $32,000. It is not clear from the testimony whether the witness meant that such was the rental in addition to the taxes, water charges, repairs, etc., as provided by the lease or whether he meant that such was the gross rental. The rent under the lease as stated, averaged $26,692.30 plus the taxes, water charges, repairs, etc., which would aggregate more than the sum of $32,000. One of the contestants' expert witnesses testified that including the deposit the lease was worth $80,000, and that the estate's interest therein was $40,000, less the sum of $2,500, because there was a divided ownership, making the net value $37,500. The other expert for the contestants testified that such one-half was worth $36,000.

It was also contended that the so-called Inwood tables should be used in computing the value of the lease. The average yearly income as rent of the rooms of the Daniels Hotel from April 1, 1925, to May 15, 1927, as indicated by the account was approximately $26,584.95. The yearly income from the corporation as rent on May 15, 1927, was $21,000, making an approximate average total income per year of $47,584.95. The expenditures in conducting the hotel business and for rent, taxes, etc., under the Daniels lease were approximately $42,542.54, showing an average annual profit of $5,042.41. If the Inwood tables are applicable and the ten per cent interest quotient is availed of for twenty-three and one-half years approximately, the term which the lease still had to run after the assignment, it would indicate a purchase price of $45,306.05. To this should be added the $10,000 deposit which would give a total of $55,306.05. A part of this income, however, was the result of rent received from the operation of furnished rooms in the hotel, and while the lease of the premises included the fixtures and furnishings of the hotel, and it was then

operating as a going concern, and the lease was assigned under the same conditions, and assuming that the Inwood tables are applicable, which I doubt, nevertheless I think some allowance should be made for the uncertainty which of necessity is involved in the continuation of this hotel business.

After consideration of all of the evidence, I reach the conclusion that a fair valuation for such lease, that is, the difference between the rental value and the rent reserved for the unexpired term when the assignment was made, after the alterations were completed as stated, and including the deposit, was $45,000, and that the estate's interest therein was worth $22,500.

If I am correct in this conclusion, the amount to which the estate was entitled equals a sum somewhat less than one-half of the deposit and of the expenses of the alterations as amortized.

The other asset of the estate which was sold was the decedent's interest in the corporation of Samuel Schlossman & Sons, Inc. This consisted of fifty-one per cent of the same, and in capital stock amounted to seventy-six and one-half shares thereof. The question is what was the value of this interest, and did the administratrix exercise reasonable diligence to obtain the same.

The corporation was one in which the stock was closely held. None of it, so far as the evidence discloses, had ever been sold, and it was not listed or quoted on any exchange. To ascertain its value, therefore, it is necessary to consider its assets, liabilities, profit, good will, etc. Its business consisted mainly in selling furniture upon the installment plan, and a number of statements, trial balances, tax returns, etc., were prepared after the accounting administratrix became president of the corporation.

Among these were the following: Under date of December 7, 1925, a financial statement as of November 30, 1925, made to a bank to obtain credit, signed on behalf of the corporation by Emanuel Schlossman, the vice-president, setting forth the value of the corporation at that time as $115,129, of which $107,846.72 was made up of open accounts due from purchasers of furniture on the installment plan; a financial statement as of December 31, 1925, but not made to a bank, showing an alleged deficit of $8,958.99, thus indicating the value of the corporation at that time to be $6,041.01; the Federal income tax return for the year 1925, showing a loss of $7,012.56, and indicating the same value of the corporation as that in the financial statement last referred to; a financial statement as of December 31, 1926, showing a surplus of $2,072.12, indicating the value of the corporation to be $17,072.12; the income tax return for the same year indicating the same value; a statement made to a bank to obtain credit about

four and one-half months thereafter, to wit, April 15, 1927, as of March 31, 1927, signed by Emanuel Schlossman as vice-president, indicating the net value of the corporation to be $148,583.70, of which $136,587.37 consisted of installment accounts; a financial statement as of April 30, 1927, showing the value of the corporation to be $25,564.36.

The trial balances of January 31, 1927, February 28, 1927, and March 31, 1927, do not contain the actual inventory values, and hence the value of the corporation cannot be ascertained from them.

There is a marked difference between the statements made to obtain credit from banks and the financial statements and tax returns, as will be noted. It has been testified that the bank statements were incorrect, and it is fair to assume that they were made to show a higher corporate valuation than those prepared for other purposes. This appears clearly from the financial statement made to the bank and the trial balance both as of March 31, 1927, in the former of which open accounts are stated to amount to $136,587.37, and in the latter to $106,587.37, a difference of $30,000.

None of the statements made to banks list among the liabilities unrealized gross profits which are, however, included in the other statements and balance sheets. No trial balance or financial statement as of May 15, 1927, the date of the sale of the corporation, has been put in evidence. No credit has been given in any of the documents referred to for good will.

A witness called on behalf of the administratrix testified that the value of the outstanding accounts in the installment furniture business were worth approximately forty to forty-five per cent of their face amount, and that the value of the business, based upon the financial statement of April 30, 1929, was between $13,000 and $15,000. The witness allowed nothing for good will.

It is manifestly impracticable within the limits of an opinion to analyze the voluminous testimony and exhibits in this matter. I have above indicated only a few of the many difficulties met with in an attempt to arrive at a reasonable valuation for the corporation.

The method now generally adopted and sanctioned by the authorities, at least in transfer tax matters, for valuing stock in a closely held corporation where the stock has not been listed, and where there have been no sales, consists of adding to the value of the net assets of the corporation the value of the good will of its business and dividing the result by the number of shares of stock into which the capital is divided, and there appears no reason why this method should not be applied to the present problem.

The usual practice followed to ascertain the value of good will is to take the average annual net profits over a period of years, deduct the interest on the average amount of capital invested and multiply the result by a suitable number of years' purchase. (*Matter of Gorsline*, 225 App. Div. 720; *Matter of Silkman*, 121 id. 202, 218; affd., 190 N. Y. 560; *Von Au* v. *Magenheimer*, 115 App. Div. 84; 126 id. 257; affd., 196 N. Y. 510.) The number of years for ascertaining average net profits and the number of years' purchase to be taken in each case is subject to no fixed rule, but depends upon the circumstances of the particular corporation or business. (*Matter of Ball*, 161 App. Div. 79; *Matter of Keahon*, 60 Misc. 508; *Matter of Gumbinner*, 92 id. 104; *Matter of Demarest*, 157 N. Y. Supp. 653.)

The alleged profits during four years and four months of the life of the corporation, that is, up to April 30, 1927 — the last date to which any financial statement in evidence brings the accounts of the corporation — as shown by the corporation's Federal income tax returns and by a financial statement in evidence, after deducting therefrom a profit made upon the sale of a lease in 1926, and not realized from the conduct of the business, was $9,903.88. To this should be added the salaries which I have heretofore stated will be disallowed, up to the same date. These amount to the sum of $25,958.33, making a total of $35,862.21 or an average of $8,275.89 for each year. The average capital employed per year during these four years and four months, as ascertained from the income tax returns and exhibit last referred to, with the addition of the salaries disallowed, amounts to $23,106.79. Subtracting the sum of $1,386.40, the interest on this amount for one year, from the average yearly net profits, leaves a balance of $6,889.49.

While the corporation had only been in business for a little over four years, the decedent had conducted a furniture business in the immediate neighborhood for many years, and his name formed the greater part of the corporate title. Under these circumstances, the good will was greater than it would have been if the corporation had been a new concern operating under an entirely different name. In my opinion, a fair number of years' purchase to be taken in this case in order to ascertain the value of the corporation, is four years.

Assuming that this is correct, the good will would be worth $27,557.96. To this must be added the net value of the assets, to wit, $25,564.36, and the sum of $26,375 being the amount of salaries paid and disallowed as heretofore stated, making a total of $79,497.32 which I find was the value of the corporation at the

time of the transfer of the decedent's share therein by his administratrix to Emanuel Schlossman and Saul Schlossman. This share amounted to fifty-one per cent thereof, worth $40,543.63. The interest of the decedent in the lease having been valued at $22,500, makes the total value of all of the assets transferred by the administratrix to Emanuel Schlossman and Saul Schlossman $63,043.63. As she received only $30,000 therefor, as heretofore pointed out, it follows that she must be surcharged with the sum of $33,043.63 by reason thereof.

No commissions will be allowed to the administratrix under the circumstances, except upon the amount of rents collected upon the real estate which she managed with the consent and acquiescence of the heirs at law and which she included in her account without objection, and as to which her account was found to be correct. She would have been entitled to employ a real estate broker and pay him for such collection under the circumstances, and hence in my opinion should be compensated for her services.

Costs will be awarded to the parties who have appeared by counsel herein, payable out of the estate.

Settle decision and decree accordingly.