(No. 7007. December 23, 1942.)

IN THE MATTER OF THE ESTATE OF MARY ELIZABETH RANDALL, DECEASED.

[132 Pac. (2d) 763.]
[135 Pac. (2d) 299.]

Rehearing denied January 25, 1943.
Remittitur recalled February 15, 1943.
Rehearing again denied March 17, 1943.

Murray Estes and Hamer Budge for appellants.

W. F. McNaughton, Wm. S. Lee and J. H. Felton for respondents.

GIVENS, C.J.—Two previous appeals herein culminated in a determination that a will, filed by, and under which appellants (daughters of deceased intestate) had been appointed executrices, was invalid and had been procured by them by fraud and undue influence. (Estate of Randall, 58 Ida. 143, 70 P. (2d) 389, 60 Ida. 419, 93 P. (2d) 1.)

Whereupon, respondent Almeron E. Randall (son of deceased) was appointed by the Probate Court administrator of the estate involved. Thereupon, appellants, as retiring executrices, filed their final account in said court for approval. Upon objections interposed thereto, and claim that appellants should have paid rent while occupying the family residence after the mother's death, by respondents, Almeron E. Randall, Arthur W. Randall, son, Ora Randall Johnson, daughter, and Barnard Randall, Wayne Randall, and Dean Randall, grandchildren (children of Alfred B. Randall, a deceased son), the Probate Court after a complete hearing entered judgment approving said account with some modification.

Upon appeal to, and trial de novo in, the District Court, the approving portion of such judgment was reversed, hence the appeal herein.

The court refused to approve the part of appellants' account asking for reimbursement of all fees, expenses, court costs, and attorneys' fees in connection with the previous suits wherein appellants attempted to sustain the validity of the will and in connection with the administering of the estate. Except as noted below, this was correct because the determination that the will in their favor had been procured by their fraud and undue influence deprived appellants of the right to be reimbursed from the estate for such expenses. (In re Jones' Estate, 166 Cal. 147, 135 P. 293; In re McKinney's Estate, 112 Cal. 447, 44 P. 743;

In re Arnold's Estate, 121 Cal. App. 247, 8 P. (2d) 897; *Minnesota Loan & Trust Co. v. Pettit*, 144 Minn. 244, 175 N. W. 540; *Davison v. Sibley*, 140 Ga. 707, 79 S. E. 855.)

The filing fee in the Probate Court, costs of publication and notice to creditors, and other items amounting to $233.72, covering miscellaneous incidental expenses in the handling of the estate were disallowed because assertedly not supported by proper proof. These expenses would necessarily have been incurred by anyone handling the estate, were not unreasonable, were sufficiently proven, and therefore should have been allowed.

Appellants did not list as assets of the estate $56,995.92 of certificates of deposit, with accrued interest thereon of $12,060.07, and $4,802.36 of negotiable warehouse receipts covering grain on hand at the time of decedent's death, with accrued interest of $1,952.76, because they claimed these certificates had been given to them by their mother prior to her death as their own, sole, individual, and separate property and, therefore, did not become or constitute any part of the estate. Respondents contended such gifts were not sufficiently proven and, in any event, were invalid as having been procured by undue influence.

Appellants challenge the jurisdiction of the Probate Court to determine title to or ownership of these certificates of deposit and warehouse receipts, taking the position that an independent action should have been prosecuted in the District Court by the present administrator against them to determine such questions, relying on *Miller v. Mitcham*, 21 Ida. 741, 123 P. 141; Estate of Blackinton, 29 Ida. 310, 158 P. 492; and *Simonton v. Simonton*, 33 Ida. 255, 193 P. 386. The first two of these cases involved claims by a third party to real estate, the court holding the Probate Court did not have jurisdiction of such an action because it could not determine title to real property. The Simonton case involved a creditor's claim. Herein, the final accounts of the executrices were submitted by them for approval, and even though after the invalidity of the will had been established they no longer continued executrices as such, it was necessary that they make a final account and that the same be passed upon by the Probate Court. (Secs. 15-1108-11, 15-1115, 15-1118-9, 15-1331, I. C. A.; *Stevens v. Superior Court*, 155 Cal. 148, 99 P. 512; In re Nolan's Estate, 56 Ariz. 366, 108 P. (2d) 391.)

■ The authorities almost uniformly hold a Probate Court has jurisdiction to pass upon what property, in the possession of such executor, should be included in the final account. (*Stevens v. Superior Court,* supra; In re Fulton's Estate, 188 Cal. 489, 205 P. 681; *Coleman v. Crawford,* 140 Wash. 117, 248 P. 386; *Bauer v. Bauer,* 201 Cal. 267, 256 P. 820; In re Kelpsch's Estate, 203 Cal. 613, 265 P. 214; In re Roach's Estate, 208 Cal. 394, 281 P. 607; *Security First Nat'l Bank v. King,* 46 Wyo. 59, 23 P. (2d) 851, 90 A. L. R. 125; In re Escolle's Estate, 134 Cal. App. 473, 25 P. (2d) 860; In re Bogg's Estate, 33 Cal. App. (2d) 30, 90 P. (2d) 814; *Waterland v. Superior Court,* 15 Cal. (2d) 34, 98 P. (2d) 211; In re Hovland's Estate, 38 Cal. App. (2d) 439, 101 P. (2d) 500; note, 90 A. L. R. 134.) There may be said to be some authority to the contrary. (In re Dolenty's Estate, 53 Mont. 33, 161 P. 524; In re Jenning's Estate, 74 Mont. 449, 241 P. 648; note, 90 A. L. R. 139.)

After the mother's death appellants continued to reside in the family home. The court found:

"XV. That from January 17, 1935, to the date of the appointment of Almeron E. Randall as administrator on the 14th day of October, 1939, Mattie L. Randall and Eva O. Randall occupied Block 4 of Robbins Addition to the Town of Moscow, Idaho, one-half of which property is a part of this estate; that a fair rental value of such property is the sum of $20.00 per month; and that Mattie L. Randall and Eva O. Randall should be charged rental thereof in one-half of that amount, or the sum of $570.00."

■ Appellants are heirs of the estate whether they take under the will or under the law of succession. (Sec. 14-103, I. C. A.; *Connolly v. Probate Court,* 25 Ida. 35, 136 P. 205.) If the will had been valid, they would have taken the entire title, and under the law of succession they still take a child's share. It having been decided that they could not take under the will, it follows that appellants and respondents were all equal heirs and tenants in common of the estate, and appellants were each owner of an undivided one-sixth of an undivided one-half interest of the house.

■ It is an established rule in this state, as well as elsewhere, that a tenant in common is entitled to the use and possession of the common property, subject only to the condition that he may not exclude another cotenant from like use and possession. (*Washington Irr. Dist. v. Talboy,*

55 Ida. 382, 43 P. (2d) 943, and cases cited.) It is also well settled that a cotenant in possession is liable for rent only in cases where he has leased or let property for profit, in which case he must account for the profits realized. (*Washington County Irr. Dist. v. Talboy*, supra; 62 C.J., pp. 446-449.)

Here there is no contention made that appellants realized any rents or profits from the residence property, nor does it appear that any one of the cotenants sought possession or occupancy of the premises during the time appellants occupied it.

From January 17, 1935, to the appointment of Almeron E. Randall, October 14, 1939, the appellants were the duly and regularly appointed and acting executrices of the estate and as such had legal charge and custody of the estate for all the heirs and were duly and regularly administering it. (Secs. 14-102 and 15-802, I. C. A.)

The law requires executors and administrators to take possession of and care for the property of the estate. (Secs. 15-802 and 15-1102, I. C. A.) This must be done whether the appointment of an executor or administrator turns out to be legal or illegal, and the statute contemplates just that kind of contingency. (Sec. 15-365, I. C. A.; 11 Cal. Jur., p. 410, Sec. 161.) Such a person, whether representing the estate as executor or administrator de facto or de jure is equally liable for care of the estate and is entitled to his lawful expenses and disbursements in connection therewith. (Sec. 15-1105, I. C. A.)

Consequently, appellants are not liable for rent for the period of their occupancy.

As to the alleged gifts, the principal bone of contention, the court found as follows:

"XII. Upon the issue raised by the proposed final account of Mattie L. Randall and Eva O. Randall and the objections thereto, the court finds that Mattie L. Randall and Eva O. Randall, upon the death of John E. Randall on October 25, 1925, became actively engaged in assisting their mother, Mary Elizabeth Randall, who was named executrix in the John E. Randall will, in carrying out the probating of the John E. Randall estate, and after the death of John E. Randall became constant close companions of their mother to the exclusion of her other children. That the said Mattie L. Randall and Eva O. Randall became and were

the confidential advisors of their said mother in every and all business transactions and took active part in the management thereof. That in the last illness of said Mary Elizabeth Randall on or about the 13th day of November, 1934, and about a week before her death, the said Mattie L. Randall and Eva O. Randall prevailed upon their mother to endorse over to them the said certificates of deposit amounting to $56,995.92 * * *. That the said Mary Elizabeth Randall did not give or intend to give said certificates of deposit or any part thereof to Mattie L. Randall and Eva O. Randall or either of them for their own use and benefit.

"The court finds that neither the said Mattie L. Randall nor Eva O. Randall considered the said endorsement of said certificates or any of them as a gift to them or either of them during the lifetime of the said Mary Elizabeth Randall nor did either of them so consider, or treat, or claim them, or any of them, until after the purported will which they endeavored to have probated had been declared void. That the said Mattie L. Randall and Eva O. Randall reported the earnings of said certificates of deposit as estate earnings in their income tax returns to both the State of Idaho and Federal Governments for the years 1934 to 1938, inclusive, and reported said certificates to the Federal Government as a part of the estate of Mary Elizabeth Randall, deceased, and the court finds that said certificates, notwithstanding said endorsements, were and are a part of said estate, and that the said Mattie L. Randall and Eva O. Randall's claims thereto are false and fraudulent, that they have converted the same to their own use and benefit, and that they should be charged therefor in the sum of $56,995.92 with interest thereon at the rate of three per cent per annum from date of the original certificates to this date. Said interest amounting to the sum of $12,060.07.

"XIII. The court finds that on or about the 13th day of November, 1934, and about a week before the death of Mary Elizabeth Randall, Mattie L. Randall and Eva O. Randall prevailed upon their mother to endorse to them in blank the grain certificates set forth in paragraph VIII hereof. That said endorsement was not intended by Mary Elizabeth Randall as a gift to Mattie L. Randall and Eva O. Randall or either of them for their own use and benefit, nor were the said certificates accepted by them or treated by them as their own until after the said purported will

had been adjudged void as fraudulent. That the claim of said Mattie L. Randall and Eva O. Randall to said grain certificates is false and unfounded. That the same were a part of the estate of Mary Elizabeth Randall at the time of her death, that they have converted the same to their own use and benefit, and the said Mattie L. Randall and Eva O. Randall should be charged therewith in the sum of $4802.36 with interest at the rate of six per cent per annum from November 20, 1934. Said interest amounting to the sum of $1,952.76."

Appellants urge the burden of proof was upon respondents to disprove a valid gift, as they claim is declared in *Turner v. Gumbert*, 19 Ida. 339, 114 P. 33; *Shaughnessy v. Hood*, 21 Ida. 709, 123 P. 641; *Coe v. McGran*, 23 Ida. 582, 131 P. 1110; and Estate of Randall, 60 Ida. 419, supra. Respondents counter with the thought that there was a fiduciary relationship existing between the intestate and appellants, hence, the burden of proof was upon them to overcome the presumption that the gift was fraudulent as obtained through undue influence. (*Smith v. Smith*, 84 Kan. 242, 114 P. 245, 35 L. R. A., N. S. 944; *Coblentz v. Putifer*, 97 Kan. 679, 156 P. 700; *Campbell v. Genshlea*, 180 Cal. 213, 180 P. 336; *Blackburn v. Jones*, 59 Utah 558, 205 P. 582; *Meyer v. Campion*, 120 Wash. 457, 207 P. 670; *Lay v. Proctor*, 147 Ore. 545, 34 P. (2d) 331; In re Miller's Estate, 16 Cal. App. (2d) 141, 60 P. (2d) 492; *Overstreet v. Beadles*, 151 Kan. 842, 101 P. (2d) 874; *Floyd v. Floyd*, 11 Fed. (2d) 841; *Thaw v. Thaw*, 27 Fed. (2d) 729.)

The donor's intent to make a gift must be clearly established. (*Monnette v. Title Ins. & Trust Co.*, 107 Cal. App. 313, 290 P. 668; *Stevenson v. Hunter*, 131 Kan. 750, 293 P. 500; In re Belgard's Estate, 202 Iowa 1356, 212 N. W. 116; *Swift v. W. B. Worthen Co.*, 176 Ark. 585, 3 S. W. (2d) 316.)

It is likewise the rule that the burden of proof is upon the party asserting a gift to have been made, to, in the first instance, prove that it was a valid gift. (28 C. J., pp. 669-670, Sec. 71; *Brown v. Canadian Industrial Alcohol Co.*, 209 Cal. 596, 289 P. 613; *Coblentz v. Putifer*, supra; *Jenkins v. Jenkins*, 66 Ore. 12, 132 P. 542.)

There should also be taken into consideration the further rule that the burden is on one asserting there are additional assets to those listed by the executrices to prove

the same. (In re Perry, 114 N. Y. S. 246; In re Watson, 148 N. Y. S. 902; In re Fisher's Estate, 124 Misc. Rep. 836, 209 N. Y. S. 300; In re Schlossman's Adm'x, 136 Misc. Rep. 893, 242 N. Y. S. 417; In re McCafferty's Will, 264 N. Y. S. 38; In re Chandler's Will, 175 Misc. Rep. 1029, 26 N. Y. S. (2d) 280; *Steward v. Barry,* 102 Ohio 129, 131 N. E. 492.)

Harmonizing these various rules, it would seem that where the gift is to executrices who are shown to be fiduciaries the burden of proof is upon such donees to clearly and unequivocally prove a gift in the first instance, and to so prove it that there would be no uncertainty as to the intent (and other requisite concomitants) on the part of the donor nor any question of undue influence exerted by the donee upon or over the donor or advantage taken of the confidential relationship existing between the parties. (In re Schlossman's Adm'x, supra; In re Gentry's Estate, 139 Misc. Rep. 759, 249 N. Y. S. 296; In re Brown, 86 Misc. Rep. 187, 149 N. Y. S. 138; In re Greenberg's Will, 158 Misc. 446, 286 N. Y. S. 56; In re Smith's Estate, 237 Penn. 115, 85 Atl. 76; *Tygard v. Falor,* 163 Mo. 234, 63 S. W. 672; *Myers v. Tschiffely,* 73 Fed. (2d) 657.)

The evidence shows without dispute that these two daughters had lived with their mother and father their entire life; that Mattie Randall accompanied the father to Portland and remained there with him some two years while he was in the earlier stages of his final illness; that during that time she worked and, in the main, if not entirely, supported herself. The two appellants testified, without contradiction, that they did not receive any money from their parents, though evidently they received their actual board and room while living in the family home at Moscow. The father, predeceasing the mother, willed a life estate in his property to the widow with the remainder to be distributed share and share alike to the children.

After the father's death the mother was evidently the controlling and managing head of at least her portion of the estate, and the evidence discloses, without material dispute, that she was a capable woman and had made up her own mind with regard to the disposition and handling of the property.

The evidence favorable to respondents' contention that there was undue influence and which the trial court

apparently relied upon is that the daughters lived with the mother; that respondent Almeron Randall was not in the home and at one time immediately after the father's death when the mother took up with him the question of renting some of the land to him, she was dissuaded from doing so by appellants; that none of the other children were ever with their mother when she was alone, that is, in the absence of one or both of appellants; that the letters sent by the mother were written for her by appellant Mattie Randall, and apparently all letters received by her were read by them; that the certificates and grain receipts were not exclusively claimed by appellants as their property during the handling of the estate, that the income therefrom was reported as income from the estate in connection with payment of income tax to the state and federal governments and at one time reported as the individual property of appellants; certain claimed inconsistent statements made by appellants during the hearings before the Probate Court and in connection with whether they had received any gifts from their mother, and discrepancies as to the amount thereof, and commingling of funds; that their positions prior to the time the will was declared invalid and now are inconsistent in that they claimed these certificates under the will and now they claim by gift. On the other hand, the daughter Ora Randall Johnson visited in the home occasionally; Arthur Randall's children were reared by appellants under their mother's supervision, and appellants devoted their entire time and attention, with the exception of such portion of the business day that at times they were employed in Moscow, to their parents and in caring for them. Under the will, appellants being sole devisees, the fact that they reported the income from these certificates at one time as their own and at one time as belonging to the estate loses its efficacy since if the will had been valid they would have been sole owners, and it would have been immaterial how they reported. They contended the proceeds from these certificates were thus reported at the suggestion of state and federal income tax agents.

The evidence with regard to the immediate act of donation and Mrs. Randall's mental condition is disclosed by the testimony of Mr. Cahill, a banker of Moscow, who was sent for by Mrs. Randall and was present at the time these certificates were endorsed, appellants, the attending physician, and neighbors, as follows:

Mr. Cahill testified:

"Q. Did you have occasion to see her [Mary Elizabeth Randall] on or about the 11th or 12th of November, 1934?

".A. Yes, I saw her.

"Q. Drawing your attention to the call made by you to her home in Moscow, will you relate what took place, Mr. Cahill?

"A. Well I was called up there along sometime around noon, or maybe about one o'clock, a little after noon, and she was in bed at the time I called, sitting up in bed, she explained the situation to me as fully as she could and then wanted to know if she could get a transfer of the certificates without losing their interest.

"Q. And what took place?

"A. I told her she could make the transfer by endorsing them, and she then asked Mattie to go upstairs and get the pocketbook these certificates were in; she done so, and Mattie handed her the pocketbook and she segregated the certificates, handing one to each one of the girls and looked the rest of them over and had them endorsed.

"Q. I call your attention to Plaintiff's Exhibit 158, made up of nine certificates of deposit, I will ask you to look those over, Mr. Cahill, and advise the court whether or not those are the certificates that were presented you that day?

"A. (Examines certificates.) They all look the same.

"Q. And are they the ones that were—

"A. I think they are, to the best of my knowledge.

"Q. Now drawing your attention to that portion of the writing on the back of each one, that is, where it states, 'Pay to the order of Eva O. Randall,' 'Pay to the order of Mattie L. Randall', or 'Pay to the order of Eva O. Randall and Mattie L. Randall', who wrote that there?

"A. Mattie wrote that.

"Q. Will you relate the conversation leading up to that being written on there, Mr. Cahill?

"A. I don't know what you mean.

"Q. At whose request was that written?

"A. Well, it was request—request of Mrs. Randall; in fact, she handed each one of the girls the certificate of ten

thousand or more, which ever it may be, and then she says, 'I want the others to go to both, and be sure and take care of the taxes,' that is about the extent of the conversation as I remember.

"Q. Were they signed by Mrs. Randall?

"A. Yes, they were.

"Q. In your presence?

"A. Yes, they were.

"Q. Now you had talked with Mrs. Randall on many occasions before that had you not?

"A. Yes.

"Q. And what would be your opinion evidence of her mental condition and her mental capacity the day you were there and at the time these instruments were endorsed?

"A. Oh, I couldn't see anything different than she had been previous to that.

"Q. You mean she appeared to be just as capable mentally as she had been at any time while you knew her?

"A. Yes."

On cross-examination Mr. Cahill testified:

"Q. Mr. Cahill, as I understood you, you said Mrs. Randall that day when you were up there, wanted to know if she could make arrangements so she would not lose any interest?

"A. I am pretty sure that is what she said.

"Q. And after she sent Mattie upstairs to get the certificates, you say there were two larger than the rest, about $10,000.00?

"A. Yes, above $10,000.00, yes.

"Q. And she—you said that she said something about that there was one for Eva and one for Mattie?

"A. Eva was on one side of the bed and she handed it over to Eva, and then she leaned forward and handed the other to Mattie.

"Q. And said she wanted them to have those?

"A. Said 'those are your certificates.'

"Q. Did you say she had promised them the certificates?

"A. No.

"Q. Then she endorsed the others to Mattie L. and Eva O. Randall?

"A. Yes.

"Q. And gave those to Mattie?

"A. Yes.

\* \* \*

"Q. That was the only transaction, was there any other transaction that day?

"A. That day?

"Q. Yes.

"A. Not that I know of, someone asked about, I would not say who, in regard to transferring grain tickets, I said 'take the ticket, all you have to do is sign the back.'

"Q. They were not signed then?

"A. I don't remember, I left at that time, they may have been signed while I was there."

· The appellant Eva O. Randall testified thus:

"Q. Just describe to the court, Miss Randall, the circumstances under which these instruments to which you refer, were signed.

"A. Mother had someone from the house call up Mr. Cahill, and Mr. Cahill came up to the house and went in the room where Mama was—

"Q. What room?

"A. That was the dining room, we didn't have no bed room downstairs and had this dining room for a bed room, and Mr. Cahill went in the bed room in the dining room where Mama was, Mama was sitting up in bed and she asked Mr. Cahill how she could endorse the certificates and grain receipts over to Mattie and I, and he told her and they had a conversation.

"Q. Who was present at that time?

"A. Mr. Cahill and my Mother and Mattie and I.

"Q. Were these exhibits concerning which you have testified, the ones that you have testified bear your Mother's signature, produced at that time?

"A. Yes, sir, they were.

"Q. Do you know what took place after they were produced?

"A. After they were produced, after Mama signed them,

she gave them to whichever one they were, one she gave to me, one she gave to Mattie, this was the two large checks, then she signed the others, and after the others were signed she gave them to Mattie, those had both of our names.

"Q. Is that true of the warehouse receipts?

"A. Yes, sir.

"Q. As well as the certificates of deposits?

"A. Yes, sir, it is.

\* \* \*

"Q. Now in connection with that last illness, at what date were these various exhibits concerning which you have testified, when were they endorsed?

"A. Oh, let me see—about two weeks I should judge, close to two weeks.

"Q. Prior to your Mother's death?

"A. Yes.

"Q. And during that period of time what was the mental condition of your Mother?

"A. She was just the same as she always was, just fine until right up to the very last; I was with her all the time.

\* \* \*

"Q. Now drawing your attention to Plaintiff's Exhibit 158, being the nine certificates of deposit concerning which you testified a while ago, will you state what took place prior to the time that Mattie endorsed on those, 'Pay to the order of Mattie L. Randall and Eva O. Randall', what took place prior to that writing by Mattie?

"A. Why Mama, she—she asked Mr. Cahill to write this on here, and Mr. Cahill, he says, 'No, Mattie, you write it', handed them over to Mattie, and then Mattie, she tried to find something to write with, didn't have no pen—didn't have any ink, I guess the pen had no ink, then Mr. Cahill he took his pen out and handed it to Mattie but it was dry, and so then they suggested that I should go over to Judge Nelson's and get some ink, and I did, then Mr. Cahill, he told Mattie to write what he dictated to her and she wrote it.

"Q. What was done with the instruments after that?

"A. Then they handed them back to Mama, then Mama signed them.

"Q. Now where was she at the time she signed them?

"A. She was sitting up in bed, she was propped up—No—

"Q. Had she been lying down before Mr. Cahill came?

"A. Yes, I think she had.

"Q. Did your Mother have any help with them?

"A. Oh, my no."

The appellant Mattie L. Randall testified:

"Q. Will you state to the court the circumstances under which she endorsed that?

"A. Well, Mr. Cahill was called up to the house, after he got there he talked to Mama; she told me to go upstairs and bring them down, and then she asked Mr. Cahill how to go about turning them over to Eva and I.

"Q. This is the grain receipts?

"A. Yes, grain receipts.

"Q. Did she endorse them at that time?

"A. She endorsed them at the time she did the certificates, yes, sir, same time she endorsed the certificates.

"Q. Handing you Plaintiff's Exhibit 158 for identification, will you explain what those are?

"A. These are certificates of deposit— * * *

"Q. Now I will ask you to examine the endorsement on the back, look at each one and explain to the court in whose handwriting, 'Mrs. John E. Randall', is.

"A. That is mama's.

"Q. Examine each one—

"A. (Examines certificates.) They are all in mama's handwriting.

"Q. State to the court the circumstances under which they were endorsed by Mrs. John E. Randall.

"A. I—she endorsed them; she endorsed them and gave them to me, she endorsed them and—

"Q. Just what took place at the time she endorsed them?

"A. Well, Mr. Cahill was there and Eva and I was.

"Q. How did Mr. Cahill happen to be there?

"A. He was called, mama had him called up, he just run up to the house, and she wanted to know how she could transfer the certificates to Eva and I, and the grain tickets,

and Mr. Cahill told her to just write, 'Pay to the order of', and sign them.

"Q. Did she endorse them at that time?

"A. Yes, she did.

"Q. What did she do with them after they were endorsed?

"A. Well, she gave the two large ones, gave one to Eva and one to me, and the rest, gave all the rest of them to me."

Dr. Dunn, who attended Mrs. Randall, testified with regard to her mental ability as follows:

"Q. How was her mental condition Doctor at the time you first saw her?

"A. From the standpoint of rationality and mental state, I would consider her mental state average for a person of her age and personal habits, average person between the ages—any where between fifty and eighty, in other words, normal.

"Q. You would consider she was in a normal condition and knew the meaning of her acts at that time?

"A. Yes, sir.

* * *

"Q. Now will you describe to the court the mental condition of Mrs. Randall from the 12th on down to the time of her death?

"A. Her mental condition is what—at that time, I have already stated—mental condition about average for a person of her age or for an ordinary person past fifty. In other words, I would not consider her abnormal in any way at that time, and she remained the same up to the day before she died—about—

"Q. You would not consider her abnormal in any way?

"A. That is right.

"Q. You would consider her mentally competent until about the day before she died?

"A. About a day and a half before she died, she became irrational; by that I mean she would drop off to sleep and then came out of it and talk a while and then go back to sleep. It was not so much a sleep as it was a coma; I mean from the last thirty-six hours before her death.

"Q. Then you would consider that on the 10th or 12th,

or any time along around those dates, that she was mentally competent and knew the meaning of her acts?

\* \* \*

"A. I believe she was, yes sir."

Mrs. Earl Clyde, a neighbor, testified that her condition during the time these gifts were made was as follows:

"Q. Now did you see Mrs. Randall during the time she was confined to her bed during her last illness?

"A. I saw her practically every day but the last two days before she died.

"Q. Did you see her around the 10th of November, 1934?

"A. I saw her on the 10th of November.

"Q. And every day following that you say?

"A. The last two days before she died we went to Lewiston and we were out of town.

"Q. During that period what was her mental condition so far as you could observe, Mrs. Clyde?

"A. She was mentally alert. \* \* \* In my opinion, she was mentally alert, just like she had always been.

\* \* \*

"Q. You say you would see her almost every day and there had been no change in her between those dates?

"A. I said in the last year, mentally, she was the same as she always had been. I didn't notice any.

"Q. How long have you known Mrs. Randall?

"A. All my life; I could see no change in her mental condition.

"Q. You could look and see her mental condition?

"A. No.

"Q. And she was just like she always had been?

"A. Mentally, I could see no change."

Mr. Clyde testified:

"Q. Did you have occasion to see her, Mr. Clyde, during the time of her last illness?

"A. I did.

"Q. And basing any opinion that you might have upon your knowledge of her and your acquaintance with her,

what would you say as to her mental condition at the time you saw her during her last illness?

"A. Well I saw her and talked to her and I would say her mental condition was the same as it always had been any time I had seen her before when I talked to her.

* * *

"A. Some days I wasn't there, some days I was there in the day time and other days in the evening.

"Q. And you stated she was the same as she always was mentally?

"A. As far as I could tell, she was."

Previous to these final gifts, certificates of deposit had from time to time been endorsed by the mother to appellants but retained by her in her possession and when renewed were reissued with the interest added thereto. Thus, while until this asserted final gift Mrs. Randall did not relinquish dominion over the previous certificates, it is apparent that some donative disposition of her securities was not altogether a new idea on her part evolved or presented to her in her last sickness. The strongest circumstances conducive to the thought that there was any undue influence, aside from the relationship of the parties, were Mrs. Randall's extreme age and the fact that it was during her last illness that she made these gifts. While there is strong reason to believe that Mrs. Randall was of such a forceful character that while there undoubtedly had been, from any view taken of the record, a more or less confidential feeling between her and appellants, apparently she was the dominating factor in their relationship. On the other hand, appellants cared for her, did her errands, wrote her letters, and mechanically in connection with her business did all those things which her age and general decrepit condition prevented her from doing, and there was evidently close collaboration between them in the conduct of her affairs, and, taking all circumstances shown in the record into consideration, we cannot say that there is not sufficient evidence to sustain the findings of the learned trial court that there existed a fiduciary relationship.

"Whenever the relations between two persons are such that one is completely dependent and relies upon and necessarily reposes confidence in the other, a fiduciary or confidential relation exists and the law implies a condition of superiority held by the one over the other so that in

every transaction between them in the nature of a deed, gift, contract, or the like by which the superior party obtains a possible benefit, the existence of undue influence and the invalidity of the transaction is presumed and the burden of proof is cast upon the one who receives the benefit to show by clear evidence that he or she acted with entire fairness and the other party acted independently with full knowledge and of his own volition free from undue influence. [Citing authorities.]" *Small v. Nelson*, (Maine) 16 Atl. (2d) 473.

And see *Scott v. Brown*, 90 Ind. App. 367, 157 N. E. 64; *Leedom v. Palmer*, 274 Penn. 22, 117 Atl. 410; *Peckham v. Johnson*, (Tex.) 98 S. W. (2d) 408; *McCown v. Fraser*, 327 Penn. 561, 192 Atl. 674. Therefore, such finding must be followed and proceeded upon as a valid premise.

The endorsements on the certificates of deposit and the negotiable warehouse grain receipts put them into three classes. Of the certificates of deposit, the two for $10,986.68 were endorsed specifically and individually, one to appellant Mattie L. Randall and one to Eva O. Randall. The other certificates of deposit were endorsed by Mrs. Randall to the two girls jointly. The warehouse receipts were endorsed in blank, that is, no assignee was designated. In connection with the certificates of deposit apparently, other than as to those endorsed individually to the appellants, Mrs. Randall stressed the fact she desired the taxes paid, which is inconsistent with an outright gift. Also, it will be noticed from the testimony of Mr. Cahill that he was not certain or positive as to the warehouse receipts being signed or delivered while he was there. The strong affection between mother and daughter is not sufficient to justify a conclusion of undue influence. (*Turner v. Gumbert*, supra; *Shaughnessy v. Hood*, supra; *Coe v. McGran*, supra; Estate of Randall, 60 Ida. 419, supra.) On the other hand, as indicated in the authorities above, the intention to unequivocally give must be proven. The positiveness of the transfer diminishes as we proceed from the two certificates to the others endorsed to the two appellants jointly and finally to the receipts which were endorsed without designation of endorsee or assignee. Mrs. Randall must have had in mind something different as to the three different methods of endorsement. There is not sufficient doubt or uncertainty as to what Mrs. Randall intended in connection with the two $10,986.68 certificates to justify a conclusion that

these were not valid and consummated gifts, but when we pass to the other certificates and the grain receipts, in view of the past history of this litigation and of all the circumstances disclosed in the record herein, we cannot say that the learned trial court was so far departing from a reasonable interpretation of the testimony that he should not be sustained in holding that the certificates (other than the two for $10,986.68) and the warehouse receipts were not proven gifts.

It is not shown that certain procedural matters questioned by appellants affected their substantial rights, and, therefore, it is unnecessary to consider or pass upon them.

The judgment is therefore reversed as to the rent and the two certificates of deposit for $10,986.68; otherwise affirmed, except as to the items of expense for which appellants should be properly credited and reimbursed, and the cause is remanded with instructions to enter judgment in accordance with this opinion. The proportion of income taxes paid, based upon the interest accruing from the certificates of deposit endorsed to appellants jointly and the grain warehouse receipts, since it is held they belonged to the estate, should be paid out of the estate. The proportion covering the interest received from the two $10,-986.68 certificates should be paid by appellants individually. The trial court will properly determine this matter in entering the judgment.

No costs awarded.

Holden and Ailshie, JJ., and Sutton and Featherstone, D.JJ., concur.

## OPINION DENYING PETITION FOR REHEARING

### Filed March 17, 1943

GIVENS, J.—The trial court charged appellants with interest at 3% on the certificates of deposit and 6% on the proceeds of the sale of the grain certificates. The original opinion herein affirmed the above. On petition for rehearing appellants urged they should be charged with only the interest actually earned, claiming it was reduced on the certificates of deposit, January 1, 1935, from 3 to 2½%, and January, 1936, to 2%.

The grain covered by the four warehouse receipts was sold, respectively, July 30, 1936, December 21, 28, and 29,

1936, the total proceeds amounting to $4802.36. The trial court assessed interest from November 20, 1934, when appellants first secured the certificates. The record does not disclose what was done with the money received from the sale of the grain or what interest, if any, it actually earned.

In resisting such modification of the decree of the trial court, as affirmed by the original opinion herein, respondents rely upon *Harris v. Coates*, 8 Ida. 491, 69 P. 475, where the court charged an administrator who unsuccessfully attempted to claim the entire estate for himself with the then legal rate of interest of 7%. In the Harris case, supra, it is not shown what, if any, interest was actually earned on the money in the hands of the administrator. There is a wide variance in the decisions on the point involved,[1] nevertheless, this decision has stood without apparent question for some forty years as the proper criterion in Idaho, and no compelling reasons are presented for departing therefrom.

Respondents did not cross-appeal or question the rate of interest on the certificates of deposit, though less than the legal rate of 6%. (Sec. 26-1904, I. C. A., as amended, 1933 S. L., Ch. 197, p. 390.) We will, therefore, not disturb the 3% on the certificates of deposit.

Following the Harris case, we likewise sustain the judgment fixing the rate of interest on the amount received from the sale of the grain at 6%, and the original opinion affirming the judgment in these particulars is adhered to and reaffirmed.

The petition for rehearing is denied.

Holden, C.J., Ailshie, J., Sutton and Featherstone, D.JJ., concur.

---

[1]In re Eakins' Estate, 64 Mont. 84, 208 P. 956; Ellis v. Kelsey, 241 N. Y. 374, 150 N. E. 148; Cannon v. Searles, 150 Va. 738, 143 S. E. 495; In re Eddy's Estate, 134 Misc. Rep. 112, 235 N. Y. S. 455; In re Harned's Will, 140 Misc. Rep. 151, 250 N. Y. S. 380; In re Macky's Estate, 73 Col. 1, 213 P. 131; In re Brooks' Estate, 83 Utah 506, 30 P. (2d) 1065; Re Bullion's Estate, 87 Neb. 700, 128 N. W. 32, 31 L. R. A., N. S. 350 and note; Notes, 37 A. L. R. 447; 55 A. L. R. 950; 112 A. L. R. 833.