# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 38430

| | | |
|---|---|---|
| IN THE MATTER OF THE ESTATE OF KATHLEEN R. CONWAY, DECEASED. | ) ) | |
| -------------------------------------------------------- | ) | |
| TANYA WOODEN, | ) ) | |
| Petitioner-Appellant, | ) ) | |
| v. | ) ) | |
| W. CECIL MARTIN, Personal Representative of the ESTATE OF KATHLEEN R. CONWAY and DEAN VIERS, | ) ) ) ) ) | Boise, April 2012 Term |
| | ) | 2012 Opinion No. 71 |
| Respondents-Respondents on Appeal, | ) ) | Filed: April 26, 2012 |
| and | ) ) | Stephen W. Kenyon, Clerk |
| TANYA S. VIERS, | ) ) | |
| Respondent, | ) ) | |
| and | ) ) | |
| BRUCE BOYDEN, Chapter 7 Trustee, | ) ) | |
| Intervenor-Appellant. | ) ) | |
| _____ | ) . | |

Appeal from the District Court of the Second Judicial District of the State of Idaho, Nez Perce County. Hon. Carl B. Kerrick, District Judge.

The decision of the district court is <u>affirmed</u>.

Creason, Moore, Dokken & Geidl, PLLC, Lewiston, for appellant. Tod D. Geidl argued.

Jones, Brower & Callery, PLLC, Lewiston, for respondent. Garry W. Jones argued.

_____

1

J. JONES, Justice.

This is a will contest brought by Tanya Wooden on the basis that the Last Will and Testament of Kathleen R. Conway was executed without testamentary capacity and under the undue influence of W. Cecil Martin—Conway's son, guardian, and a will beneficiary. The magistrate court denied Wooden's claims, and the district court affirmed on appeal. Because we find the magistrate court was presented with substantial and competent evidence on which to base its decision, we affirm the district court's appellate decision.

**I.**
**FACTUAL AND PROCEDURAL HISTORY**

Conway, the testator in this will contest, had three natural children during her lifetime—Tanya Viers, Kathye Ingram, and Cecil Martin. Conway also had a niece, Wooden, who was sent to live with Conway at various times during Wooden's childhood—when she was a young child, during her seventh-grade and senior years, and for several summers. Wooden testified that the two developed a close bond that lasted throughout Conway's life.[1]

Conway executed the first will at issue in this case on January 25, 2001 (the 2001 will), providing that 80% of her estate was to "be divided evenly, per stirpes, among my children, to wit: KATHYE INGRAM, CECIL MARTIN, and TANYA VIERS; and my niece, TANYA WOODEN so that each individual named receives 20% of my estate." The remaining 20% was to be divided equally among her surviving grandchildren. On January 4, 2001, Conway had been diagnosed with dementia and received a shunt system implant to relieve a buildup of fluid in her brain. In August 2003, she was also diagnosed with Alzheimer's Disease.

In February 2004, Conway's landlady, Altha Bish, filed a petition to become Conway's guardian and conservator, citing her mental infirmities and inability to fully care for herself. Martin filed a cross-petition for the same. Pursuant to a stipulation between the parties, the court in the guardianship and conservatorship proceeding entered an order appointing Martin limited guardian for Conway. The order stated:

> This shall be a limited guardianship in that the guardian shall discuss with Kathleen R. Conway all decisions regarding her health and well-being, including, but not limited to, her place or residence and her medical and/or other professional care. Kathleen R. Conway shall be allowed to participate in making said decisions to the

---

[1] Wooden testified that the two visited each other frequently, cared for each other after surgeries, and that Conway even named her firstborn, Tanya, after Wooden. Conway referred to Wooden as "Big Tanya" and her daughter as "Little Tanya."

extent of her ability with due consideration being given to her wishes . . . .

Tesco Trust and Estate Services Company was appointed conservator.

In April 2004, Martin set up a meeting for Conway with an attorney he knew, Michael Wasko.[2] Martin attended the first 15 or 20 minutes of the meeting, told Wasko that he was Conway's guardian, and confirmed information Conway gave about her children. He then left the room while Wasko and Conway discussed Conway's estate plan. Wasko testified that at the meeting, Conway directed him that 90% was to go to her three children, with 10% going to Wooden and Conway's grandchildren.[3] Following the meeting, Wasko prepared the will and then met with Conway again in May 2004, at which point she gave him a handwritten note reaffirming her earlier direction.[4] Some unidentified changes to the will were then made. Conway executed the will at a third meeting on May 21, 2004 (the 2004 will), with Wasko and Perry Justice acting as witnesses.

Martin only attended the first of the three meetings with Wasko. He testified that he first discovered the will had been executed when he called Wasko in late summer 2004 because he was concerned about its progress.[5] He said he later learned of the will's provisions when he received a copy of it sometime in September 2004.[6] The 2004 will provides:

> Ninety (90%) Percent of my entire estate shall be divided equally between my three (3) children, Tanya S. Viers, L. Kathye Ingram and W. Cecil Martin, as each his/her sole and separate property, including income therefrom ….

> The remaining Ten (10%) Percent of my entire estate shall be divided equally between my grandchildren, DEAN VIERS, MEGAN K. LOWE, EIL INGRAM, COLBY W. MARTIN, KELSEY R. MARTIN, and LAUREN K. MARTIN, and my niece, TANYA WOODEN, to be held in trust …

---

[2] In this dispute, Wooden questions the propriety of taking Conway to Wasko rather than her court appointed guardian ad litem, attorney Julie Deford, or the attorney who drafted the 2001 will, John Bujak. Martin testified that he did not consult Conway about which attorney she would prefer but chose Wasko because "he was a familiar name, and kind of a hometown country-type lawyer I felt my mom could relate to." Wasko testified that he was an experienced estate planner who worked on more than approximately 100 estates per year.

[3] Wasko testified that Conway explained to him at that time why Wooden was important to her, including that she had essentially raised her.

[4] The note in the record is virtually unreadable, but Wasko testified that it said, "Big Tonya [sic], small part; Cecil, Kathye, Little Tonya [sic], equal parts."

[5] Wasko's testimony and Wooden's Exhibit No. 2—which contains two telephone messages to Wasko from Martin inquiring about the progress of the will—also indicate that Martin was in the dark regarding the will until well after it was executed.

[6] The record contains a letter from Wasko to Martin dated September 20, 2004, enclosing a copy of the will.

Compared to the 2001 will, it reduces Wooden's share from 20% to approximately 1.43% and increases Martin's share from 20% to 30%.

Conway died March 15, 2009. On June 9, 2009, Martin filed the 2004 will with the court. Martin was appointed personal representative in informal probate proceedings, and the will was admitted to informal probate. Wooden filed a Notification of Competing Will, followed by a Petition for Formal Probate of Will. She claimed that the 2004 will was invalid because it was executed without testamentary capacity and under the undue influence of Martin, making the 2001 will the last valid will of Conway. A trial was held on those issues, and the magistrate court orally ruled on January 8, 2010, that the 2004 will was valid, denying Wooden's claims. Wooden appealed to the district court, claiming that the magistrate court made several evidentiary errors, misapplied the presumption of undue influence with regard to Martin, and made unsupported findings regarding Conway's testamentary capacity. On November 29, 2010, the district court issued an opinion affirming the magistrate court's determination. Wooden timely appealed to this Court.[7]

## II.
## ISSUES ON APPEAL

I.     Did the magistrate court fail to apply the legal presumption of undue influence in light of the fiduciary relationship between Conway and Martin?

II.    Did the magistrate court abuse its discretion in excluding Wooden's testimony of statements made by Conway on the basis that such statements were inadmissible hearsay or otherwise irrelevant?

III.   Did the magistrate court abuse its discretion in excluding documents filed in Conway's guardianship and conservatorship proceeding on the basis that they were inadmissible hearsay or otherwise irrelevant?

IV.    Did the magistrate court err in relying on the opinion of Wasko in determining that Conway had testamentary capacity?

## III.
## DISCUSSION

### A.     Standard of Review

"On appeal of a decision rendered by a district court while acting in its intermediate appellate capacity, this Court directly reviews the district court's decision." *In re Doe*, 147 Idaho

---

[7] On June 2, 2011, this Court granted a Motion to Intervene filed by Bruce Boyden, the Chapter 7 Trustee in a bankruptcy proceeding filed by Wooden. The record was augmented with the docket from Wooden's bankruptcy case, which included an order exempting 75 percent of her interest in this will contest from the bankruptcy estate and allowing her to continue pursuit of her claim in this matter.

243, 248, 207 P.3d 974, 979 (2009). However, to determine whether the district court erred in affirming the magistrate court, independent review of the record before the magistrate court is necessary. *Id.* "If the magistrate court's findings of fact are supported by substantial and competent evidence and the conclusions of law follow from the findings of fact, and if the district court affirmed the magistrate's decision, [this Court] will affirm the district court's decision." *Hausladen v. Knoche*, 149 Idaho 449, 452, 235 P.3d 399, 402 (2010) (citing *Losser v. Bradstreet*, 145 Idaho 670, 672, 183 P.3d 758, 760 (2008)). Decisions to exclude evidence as hearsay are subject to an abuse of discretion standard. *Jeremiah v. Yanke Machine Shop, Inc.*, 131 Idaho 242, 246, 953 P.2d 992, 996 (1998).

> **B.    Although the magistrate court was less than explicit in its application of the presumption of undue influence, it nonetheless recognized the presumption and there was substantial and competent evidence to support its decision.**

On appeal, Wooden first argues that the magistrate court failed to follow the presumption of undue influence applicable to parties who are both fiduciary and beneficiary of the testator. She also claims that the decision was tainted by erroneous findings that Tanya Viers was Conway's co-guardian,[8] that the "limited" status of Martin's guardianship somehow limited his fiduciary responsibility,[9] and that Martin only realized a 3.3% increase in his share via the 2004 will.[10] The district court found that "[w]hile the trial court may have inartfully set out this determination

---

[8] The court stated:

> The thing that I think we need to look at initially is, this was a co-guardianship…. presumably Tonya [sic] Viers had the same situation here where she received a benefit from the change in the will, and presumably she also was exerting undue influence …. But we never had any testimony of that. It was all centered on Mr. Martin. And there's been nothing raised about her role in this instance.

[9] The court stated:

> In this instance, the Court needs to look if there was a separation, too, of the roles of guardian and conservator. There's no proof that Mr. Martin knew of the extent of the estate. I presume he had an idea because of the pleadings in the guardianship, but he was not directing management of the funds of the ward.

> So, I—it's significant in this instance that there was a limited guardianship. There may have been a fiduciary responsibility here, but I view—the Court finds that that fiduciary responsibility was limited by the very language of the guardianship, which provided for input in decision-making by Ms. Conway.

[10] The court stated:

> Mr. Martin and Ms. Viers, who were presumed to be benefitting from their fiduciary relationship with Ms. Conway, received an additional 3.3 percent of the total estate or, in other words, one-third of ten percent. This, in and of itself, does not seem excessive.

5

within the oral findings of fact and conclusions of law, a review of the record as a whole supports the trial court's determination that Conway was not unduly influenced by her son, Cecil Martin."

A will may be held invalid on the basis of undue influence where sufficient evidence is presented indicating that the testator's free agency was overcome by another. *In re Estate of Roll*, 115 Idaho 797, 799, 770 P.2d 806, 808 (1989). Generally, undue influence is demonstrated through proof of four elements: "(1) a person who is subject to influence; (2) an opportunity to exert undue influence; (3) a disposition to exert undue influence; and (4) a result indicating undue influence." *Gmeiner v. Yacte*, 100 Idaho 1, 6–7, 592 P.2d 57, 62–63 (1979). However, a rebuttable presumption of undue influence is created where a beneficiary of the testator's will is also a fiduciary of the testator. The proponent of the will bears the burden of rebutting the presumption. *Estate of Roll*, 115 Idaho at 799, 770 P.2d at 808. As this Court explained in *Roll*:

> To rebut the presumption, the proponent must come forward with that quantum of evidence that tends to show that no undue influence existed. Once that burden has been met, the matter becomes one for the trier of fact. The existence of undue influence will be determined accordingly, and on appeal such determination will only be disturbed if not supported by substantial, competent evidence.

*Id.* Evidence relevant to the question of undue influence includes

> the age and physical and mental condition of the one alleged to have been influenced, whether he had independent or disinterested advice in the transaction, the providence or improvidence of the gift or transaction, delay in making it known, consideration or lack or inadequacy thereof for any contract made, necessities and distress of the person alleged to have been influenced, his predisposition to make the transfer in question, the extent of the transfer in relation to his whole worth, failure to provide for his own family in the case of a transfer to a stranger, or failure to provide for all of his children in case of a transfer to one of them, active solicitations and persuasions by the other party, and the relationship of the parties.

*Gmeiner*, 100 Idaho at 7, 592 P.2d at 63 (quoting 25 Am. Jur. 2d *Duress and Undue Influence* § 36 at 397 (1966)).

Here, the magistrate court correctly found—and the district court agreed—that by virtue of the guardianship, Martin had a fiduciary relationship with Conway. *See In re Randall's Estate*, 64 Idaho 629, 649, 132 P.2d 763, 772 (1942). Further, the court expressly recognized the presumption of undue influence created by that fiduciary relationship and Martin's beneficiary status. Citing *Estate of Roll,* the court stated:

> [T]he Court is also to look at the relationship between Mr. Martin and Ms. Conway, where the parties occupy the dual role of fiduciary and beneficiary, fiduciary—

6

more where the fiduciary has been actively involved in the will preparation, a law creates a presumption of undue influence. So, once that's raised, it becomes—the burden rests with the proponent to rebut that presumption.

However, Wooden is correct that the court never went on to expressly state that the presumption was rebutted and, indeed, never expressed a definite conclusion on the issue of undue influence. It should have done so. The court made other troubling findings.

First, the magistrate court found that Martin's guardianship was a co-guardianship with Tanya Viers. Both parties agree that this characterization is erroneous, as the order creating that guardianship clearly appoints Martin sole guardian. Second, the court seemed to place undue emphasis on the limited nature of Martin's guardianship. There is nothing in this Court's jurisprudence to suggest that the presumption of undue influence is affected by the particular nature of the fiduciary relationship. *See Estate of Roll*, 115 Idaho at 799, 770 P.2d at 808. Indeed, despite the fact that Martin was not conservator and that he was required to consult with Conway, he was still in a unique position to exert undue influence over her.

However, we find neither error fatal to the court's decision. Although the court continually referred to the influence of both Martin and Viers in the conjunctive, it expressly recognized that all the evidence presented related solely to Martin and thoroughly examined that evidence. Further, the court only stated that the limited nature of the guardianship limited Martin's fiduciary responsibility; it never stated it was reducing the presumption based on that limitation. The court may have simply been examining the nature of the "relationship of the parties" more closely, which is a factor relevant to the undue influence analysis under *Gmeiner*. 100 Idaho at 7, 592 P.2d at 63. Although the limited nature of Martin's guardianship is not particularly persuasive evidence in his favor, the decision of how much weight to place on such evidence is in the province of the trial court. *Weitz v. Green*, 148 Idaho 851, 857, 230 P.3d 743, 749 (2010). Further, while the court could and should have expressly applied the presumption and come to a definite conclusion on the issue of undue influence, it performed a thorough examination of the evidence in the context of the *Gmeiner* factors. That analysis shows that the magistrate court considered the issue and the presumption, and we find that its ultimate conclusion of validity was supported by substantial and competent evidence such that the district court correctly upheld its decision.

In regard to the first *Gmeiner* factor, the court found that Conway was "of reasonably good health," although she was obviously suffering from some dementia. This was supported by the

testimony of Wasko, Perry, Martin, and Martin's wife, Sandra Martin, that Conway was physically and mentally capable to live on her own and conduct herself on a day-to-day basis around the time the 2004 will was executed.[11] Second, and most importantly, the court found that Conway had independent and disinterested advice from Wasko in creating the 2004 will. This finding was well supported by Martin's and Wasko's testimony that Conway met with the attorney three times, with almost no participation by Martin. Although Wooden argues that Wasko was a suspicious choice, there is no evidence indicating that Wasko was somehow conspiring with Martin in his handling of Conway's estate planning. On the contrary, Wasko testified that Conway independently expressed the wishes that wound up in the will at their private meetings. The court also emphasized the distance between Martin and Conway during the will's formation and execution, highlighting that Conway was not moved to the Lewiston-Clarkston area—near Martin—from her Caldwell home until June 2004, after the will's execution. In fact, there was substantial evidence that Martin did not even know about the completed will or its provisions until well after it had been executed.

Third, the court found that Conway was not being deprived of any material needs, which was supported by Wasko's and Justice's characterization of her as "perky" and responsive at the time of execution, as well as other testimony of her reasonably good health at that time. Finally, the court found that the dispositions of the 2004 will compared to the 2001 will were not unnatural or suspicious. Here, the court made another clearly erroneous finding that the increase in Martin's share was only 3.3%, where the increase was actually 10%. Notwithstanding, the court also emphasized that it is not unnatural to primarily recognize the children of the testator, and Conway's relationship with Wooden was still recognized by the fact that Wooden took a share equal to that of Conway's grandchildren despite the fact that she was not a lineal descendent. Further, Martin received a share equal to that of his siblings—no more.

On the other hand, the court also considered the testimony of Wooden's expert, Dr. Kevin Kracke, who testified about the possible effect of Conway's dementia on the will and her ability to resist influence. Kracke testified that Conway was indeed suffering from mild to moderate dementia, which involves loss of long- and short-term memory—including autobiographical memory—and decrease in language, motor, and executive functions. Kracke also testified that

---

[11] For example, Sandra Martin testified that around June 2004, when Conway was moved from Caldwell to the Lewiston-Clarkston area, she was still cooking for herself regularly, taking walks by herself, and had a good memory of her family members. It wasn't until September of that year that her memory began to deteriorate somewhat, Sandra testified, but still "[m]entally … she seemed fine."

dementia can induce passivity and concluded that the 2004 will was the result of that passive state. In support of this, Kracke cited Conway's distrust of her children,[12] which seemed to vanish before the 2004 will was executed, as well as the "tremendous switch" between the provisions of the two wills. However, the magistrate court found that the change between wills was only dramatic in regard to Wooden's share and not in view of the will as a whole. The court also cited the contrary evidence from other witnesses of Conway's faculties and behavior around the time of execution in determining that Kracke's conclusion was mistaken.

In all, notwithstanding the magistrate court's several troubling statements and omissions, the district court was correct in upholding the decision. Although Kracke's testimony was conflicting, Martin presented—and the magistrate expressly considered—substantial and competent evidence sufficient to rebut the presumption and support a finding of no undue influence.

### C. The magistrate court did not abuse its discretion in excluding Wooden's testimony of statements made by Conway because such statements were inadmissible hearsay and irrelevant.

Wooden next argues that the magistrate court erred in excluding her testimony of statements made by Conway to Wooden because the statements were hearsay or otherwise irrelevant. Specifically, Wooden argues that the statements were not offered to prove the "truth of the matter asserted" but rather to demonstrate Conway's inability to resist undue influence at the time of the will's formation; thus, they did not fall within the definition of hearsay in Idaho Rule of Evidence 801(c). Martin responds that the statements were made three months before the will was executed and largely concerned Conway's personal feelings about her children, making them inadmissible. The district court similarly found that the magistrate court did not abuse its discretion because the statements were too far removed from the time of execution to be relevant and did not speak to Conway's inability to resist the undue influence of Martin.

All hearsay is inadmissible as evidence unless otherwise provided by Idaho rule. I.R.E. 802. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." I.R.E. 801(c). Accordingly, this Court has upheld the admission of out-of-court "declarations of a testator

---

[12] Kracke found evidence of Conway's distrust and alienation from her children in documents submitted at the guardianship/conservatorship proceeding, which were only admitted for the limited purpose of supporting Kracke's expert testimony.

pertaining to his mental condition . . . to prove his inability to resist the influence of others" rather than to prove the truth of those statements. *King v. McDonald*, 90 Idaho 227, 278, 410 P.2d 969, 972 (1965). Further, "[d]eclarations not confined to the time of the execution of the will, including those made both before and after, may be received provided they are not too remote to throw light upon the mental condition of the testator at the time of the execution of the will." *Id.* at 278–79, 410 P.2d at 972.

At trial, the magistrate court allowed Wooden to testify about her perception of Conway's mental condition during visits around the time of the guardianship/conservatorship proceedings and in June 2004, after the will had been executed. However, the court sustained hearsay objections to her testimony of several statements of Conway regarding her children, including that Conway had expressed "anger about her children and things that they had done to her," and that "[s]he was confused about [Martin]," "called him 'that man,'" and "was angry with him for hauling her around the countryside signing papers." In sustaining the objection, the magistrate court stated, "I think [Wooden] can tell us about [Conway's] behavioral changes without getting into the hearsay."

As the exclusion of hearsay evidence is within the trial court's discretion, this Court's review is limited to determining whether the magistrate court's decision was within the outer bounds of its discretion, consistent with the legal standard outlined above, and reached through an exercise of reason. *Brinkmeyer v. Brinkmeyer*, 135 Idaho 596, 599, 21 P.3d 918, 921 (2001). Here, the magistrate indeed acted within that standard. It appears that the out-of-court statements Wooden planned to recount focused entirely on Conway's negative feelings toward her children, which do not necessarily speak to her mental condition or particular susceptibility to influence. Indeed, they seem more directly aimed at proving their truth—that Conway was angry with her children, that they were not worthy to inherit, and that Conway did not mean for them to inherit. Thus, the court was within its discretion in deeming them inadmissible hearsay while still allowing Wooden to testify about her general perception of Conway as confused, angry, and withdrawn. In doing so, the court was able to consider the type of evidence deemed relevant in *King* without offending Idaho Rule of Evidence 802. Further, the court was also within its discretion under *King* to deem irrelevant the statements made at the time of the guardianship proceedings—three months prior to the execution of the will—on the basis that they were too remote from the execution to be probative.

10

In sum, the magistrate court did not abuse its discretion in excluding Wooden's testimony of Conway's out-of-court statements, and the district court correctly affirmed that exclusion.

**D.     The magistrate court did not abuse its discretion in excluding documents filed in Conway's guardianship and conservatorship proceeding because they contained inadmissible hearsay and were of questionable relevance.**

Wooden next argues that the magistrate court erred in excluding various affidavits and reports relied on during Conway's guardianship and conservatorship proceeding to demonstrate Conway's lack of testamentary capacity at the time of the 2004 will's execution. Specifically, she argues that the documents were subject to judicial notice under Idaho Rule of Evidence 201 and not hearsay. Martin responds that the documents are not adjudicative facts within the contemplation of Rule 201, contain inadmissible hearsay, and are irrelevant to the question of testamentary capacity. The magistrate declined to judicially notice the documents because they contained hearsay and were of little relevance, later admitting them for the limited purpose of completing the record of what Wooden's expert, Kracke, relied on in his testimony. The district court affirmed the magistrate court's decision.

Adjudicative facts may be judicially noticed by the court or upon request under Idaho Rule of Evidence 201. I.R.E. 201(c), (d). Rule 201 makes mandatory judicial notice of "records, exhibits, or transcripts from the court file in the same or a separate case" where a party requests such notice and supplies the requisite information. I.R.E. 201(d). However, "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." I.R.E. 201(b). As the district court found, the commentary of Federal Rule of Evidence 201—the federal counterpart of the Idaho rule—is enlightening in this regard. F.R.E. 201. The commentary states that "[a] high degree of indisputability is the essential prerequisite" and that "the tradition has been one of caution in requiring that the matter be beyond reasonable controversy." F.R.E. 201, note to subdivision (a); F.R.E. 201, note to subdivision (b).

Here, the documents admitted in the guardianship/conservatorship proceeding—while perhaps relied upon by the court in that proceeding to some extent—cannot be said to be free from reasonable dispute. As the district court found, "[t]here is no indication these documents are capable of accurate and ready determination by resort to resources whose accuracy cannot reasonably be questioned." Further, the documents constitute hearsay opinions of individuals

11

regarding Conway's capacity and hearsay-within-hearsay declarations of Conway herself, to which no hearsay exception applies.[13] Even sworn trial or deposition testimony from a prior case is inadmissible unless the declarant is unavailable and the party against whom the testimony is now offered had an opportunity and similar motive to cross-examine the declarant. I.R.E. 804(b)(1). The out-of-court declarations sought to be admitted here—medical professionals' and social workers' reports and affidavits—were never even tested in a prior proceeding, let alone one in which Martin had a similar motive as the present case.

Finally, as the district court found, the documents were also of questionable relevance. "Incapacity" for purposes of guardianship proceedings

> means a legal, not a medical disability and shall be measured by function limitations and it shall be construed to mean or refer to any person who has suffered, is suffering, or is likely to suffer, substantial harm due to an inability to provide for his personal needs for food, clothing, shelter, health care, or safety, or an inability to manage his or her property or financial affairs.

I.C. § 15-5-101(a)(1). Further, this Court has explained that

> Testamentary capacity is a question of fact to be determined upon the evidence in the individual case. No general rule can be devised which would be a satisfactory standard for the determination of the issue in all cases. This court has held that 'if a man is able to transact business, * * * he is clearly competent to make a will, but he may be competent to make a will and still not be able to transact business.'

*In re Heazle's Estate*, 74 Idaho 72, 76, 257 P.2d 556, 558 (1953) (quoting *Schwarz v. Taeger*, 44 Idaho 625, 630, 258 P. 1082, 1084 (1927)). This distinction between the tests for incapacity for guardianship purposes and testamentary capacity calls the relevance of the documents into question. Additionally, as indicated above, the three-month time period between the guardianship proceeding and the execution of the will makes evidence gathered for purposes of the prior proceeding even less probative. Thus, the magistrate court was also acting within its discretion in excluding the documents as irrelevant.

In sum, the district court did not err in affirming the magistrate court's exclusion of the

---

[13] In her briefing to this Court, Wooden argues that the documents were not offered for the truth of the matter asserted, but rather to simply show that they were filed with the guardianship court and to demonstrate Martin's "knowledge and judicial position at an earlier point in time." However, in light of the contents of the documents, the magistrate court was within its discretion in determining that they were more directly aimed at demonstrating Conway's condition and negative feelings toward her children. Indeed, Wooden argues in her briefing that the documents "demonstrate that Ms. Conway's condition made her susceptible to the exertion of undue influence when she executed the 2004 Will."

documents.

**E.** **The magistrate court did not err in relying on the testimony of Wasko in determining that Conway possessed testamentary capacity, and its finding of capacity was supported by substantial and competent evidence.**

Finally, Wooden takes issue with the magistrate court's reliance on Wasko's testimony regarding Conway's testamentary capacity, arguing that he never sufficiently inquired into her knowledge of the extent of her assets and could not testify to a "reasonable degree of professional certainty." Wooden also argues that Wasko was required to be qualified as an expert before providing his opinion on the subject. Martin responds that Wasko was not required to be an expert, was not required to testify to a "reasonable degree of professional certainty" and, although his memory was less than perfect, presented competent testimony that Conway knew the extent of her assets. After weighing Wasko's testimony along with the other evidence, the magistrate court found that Conway possessed testamentary capacity. The district court affirmed, finding that the magistrate's decision was supported by substantial and competent evidence.

Under the Uniform Probate Code as adopted in Idaho, "Any emancipated minor or any person eighteen (18) or more years of age who is of *sound mind* may make a will." I.C. § 15-2-501 (emphasis added). Accordingly, a

> [t]estator must have sufficient strength and clearness of mind and memory, to know, in general, without prompting, the nature and extent of the property of which he is about to dispose, and nature of the act which he is about to perform, and the names and identity of persons who are to be the objects of his bounty, and his relation towards them.

*Heazle's Estate*, 74 Idaho at 76, 257 P.2d at 558. This Court has long held that "[i]t is permissible for a lay or nonexpert witness to testify as to the sanity or competency of a person to make a will." *Schwartz*, 44 Idaho at 631, 258 P. at 1084. In addition,

> [i]n its inquiry into the capacity of the testatrix, the court may examine the purported will itself . . . . Where the will appears on its face to be a rational act, rationally performed, it is presumed to be valid. On the other hand, where a will is unnatural, unjust, or irrational, such fact, though not controlling, may be taken into consideration in determining the competency of the author.

*Heazle's Estate,* 74 Idaho at 77, 257 at 558.

At trial, Wasko testified that it was his opinion that Conway had testamentary capacity throughout his meetings with her, including on the day the will was executed. Recalling their first meeting, he described her as "alert," "perky," not distracted, and said she correctly answered

13

questions about her family members, the value of her estate, and the current date.[14] He did not notice any change in her faculties throughout the three meetings. However, he declined to give an opinion on testamentary capacity "to a reasonable degree of professional certainty," stating that he did not understand the meaning of that standard. Further, although Wasko could not remember at trial whether he specifically asked Conway about the extent of her assets at execution, he testified that the two had had a "continuing discussion" about her assets at their meetings. He also recalled that he and the other witness, Perry, spoke with her at execution long enough to test her testamentary capacity.

In addition to Wasko's testimony, the magistrate court also considered testimony from Perry, Sandra Martin, and Cecil Martin regarding Conway's capacity around the time of the will. As indicated above, these witnesses testified that although she was suffering from some dementia, Conway was of reasonably good health and able to live independently, corroborating Wasko's testimony. For example, Sandra Martin testified that in June 2004, very near the time of execution, Conway was still able to cook for herself, take walks alone, and had a good memory of her family members. The court also considered the will itself and found nothing unnatural or suspicious about its provisions to call Conway's capacity into question.

On the other hand, it seems the court also took into consideration Kracke's opinion that "the will was changed due to development of a passive state consistent with dementia" and that the change in the will was a "tremendous switch." The court also addressed Kracke's testimony that Conway exhibited memory deficiencies around the time of the guardianship/conservatorship proceeding, including failing to name the current president and forgetting her age and the names of certain people. As indicated above, however, the court gave little credence to these deficiencies, citing Kracke's testimony that people suffering from dementia can also function independently and lucidly at times. The court also noted Wasko's less-than-perfect memory of the events surrounding the will's execution.[15]

Although there is some conflicting evidence, we find that the magistrate court's decision

---

[14] Notably, Wasko testified that Conway recited her children's phone numbers from memory, as well as two of their addresses; she could not recall Tanya Viers' address. He allowed Martin to sit in on the first portion of the meeting to confirm the accuracy of Conway's memory, based on the fact that Martin had told him about the guardianship and conservatorship.

[15] For example, Wasko testified that he thought he had learned before the meetings that Conway had dementia or Alzheimer's, but could not recall whether he acquired that knowledge before or after the will was executed. He admitted that had he known more about her condition, he may have inquired further into her capacity.

14

was supported by substantial and competent evidence that Conway possessed testamentary capacity when she executed the 2004 will. Whether qualified as an expert or not, Wasko was allowed to opine on the issue under Idaho law, and, indeed, he had years of estate planning experience to support that opinion. Further, there is no support to be found for the proposition that his opinion must have been to a "reasonable degree of professional certainty." Although his memory could have been better, Wasko presented significant insight into Conway's capacity at the time of execution and indeed testified at one point that she knew the extent of her assets. Although Kracke's testimony was conflicting, the testimony of the other witnesses corroborated Wasko's opinion, and in all, the magistrate court had substantial and competent evidence before it to support its finding. Thus, the district court was correct in affirming the decision.

## IV.
## CONCLUSION

For the foregoing reasons, the decision of the district court is affirmed. The Respondents are entitled to costs on appeal.


Chief Justice BURDICK, and Justices EISMANN, W. JONES and HORTON CONCUR.