# IN THE COURT OF APPEALS OF THE STATE OF IDAHO

## Docket No. 40026

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | **2014 Opinion No. 36** |
| Plaintiff-Respondent, | ) | |
| | ) | **Filed: April 30, 2014** |
| v. | ) | |
| | ) | **Stephen W. Kenyon, Clerk** |
| DENVIL R. HAMLIN, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Elmore County. Hon. R. Barry Wood, District Judge.

Judgment of conviction and sentence for three counts of sexual abuse of a vulnerable adult, <u>affirmed</u>.

Sara B. Thomas, State Appellate Public Defender; Justin M. Curtis, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Russell J. Spencer, Deputy Attorney General, Boise, for respondent.

_____

LANSING, Judge

Denvil R. Hamlin was convicted of three counts of sexual abuse of a vulnerable adult, felony, Idaho Code § 18-1505B. On appeal, he argues the trial court erred when it denied various motions relating to Hamlin's competency, a motion to suppress his confession, and a motion to dismiss asserting constitutional claims. We affirm the judgment of the district court.

## I.

## BACKGROUND

Mountain Home police officers received a report from a social worker indicating that Hamlin may have sexually abused and economically exploited that social worker's client. The

1

alleged victim, a forty-six-year-old mentally retarded man[1] with psychiatric infirmities, was interviewed at Children at Risk Evaluation Services (CARES) in Boise. He indicated that Hamlin had touched him inappropriately. CARES conveyed the information to police officers who made arrangements to speak with Hamlin at the police station. Once there, Hamlin admitted that he had touched the victim's penis with his hand, performed oral sex on the victim, and engaged in anal sex with the victim.

Hamlin was charged with three counts of sexual abuse of a vulnerable adult. Hamlin, who is also mentally retarded, raised various motions asserting that he was incompetent to stand trial, that his confession should be suppressed, and that the statute he was alleged to have violated was unconstitutional. After the district court had denied each of the motions, Hamlin entered a conditional guilty plea preserving these three issues for appeal. Hamlin was sentenced to three consecutive, unified sentences of ten years with two years determinate, for an aggregate sentence of thirty years with six years determinate, but the court suspended the sentence and placed Hamlin on probation.

On appeal, Hamlin contends that the district court erred by finding him to be competent to stand trial, denying his motion to suppress his confession based on an alleged violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and denying his motion to dismiss the charges on grounds that the statute under which he was charged was unconstitutional. With respect to the constitutionality of the statute, he asserts that the enforcement of I.C. § 18-1505B, prohibiting sex with a vulnerable adult, denies him due process and violates equal protection.

## II.

## ANALYSIS

### A. Competency

It was apparent early in the pretrial process that Hamlin might not be competent to stand trial because he is mentally retarded. On September 3, 2010, the parties stipulated to having a competency evaluation performed by Dr. Chad Sombke. He diagnosed Hamlin with mild mental retardation and gave him a formal assessment to determine competency, the Competence

---

[1]     We endeavor to use accurate and respectful language. The Idaho Legislature has adopted a provision that favors the use of the term 'intellectual disability" and disfavors the term "mental retardation" and a host of archaic terms. I.C. § 73-114A. However, in this case, the parties and the expert witnesses use the term "mentally retarded" as a term of art and we adopt their usage.

Assessment for Standing Trial for Defendants with Mental Retardation (CAST-MR). At that time, the assessment showed that Hamlin was probably not competent. Beyond the skills measured by that instrument, an informal assessment showed that Hamlin did not understand the role of various court personnel and would have been of limited help to counsel. However, Dr. Sombke opined that "with some education and training of the court process, Mr. Hamlin could become competent in the future."

On the basis of that report, the magistrate court ordered Hamlin to undergo competency training through the Idaho Department of Health and Welfare. The training consisted of at least ten hours of didactic training and twenty hours of review that focused on legal concepts, court personnel, skills that might aid in Hamlin's defense, and courtroom decorum. After this training, the CAST-MR was administered again. This time, the assessment indicated that Hamlin was competent to stand trial. The Idaho Department of Health and Welfare examiner, Blake Brumfield, opined that Hamlin had an "elemental knowledge of the legal system and the basic understanding that certain behaviors result in legal consequences." He also recommended supportive strategies such as providing clear and concise explanations, prompting Hamlin to determine if he had questions, and repeating complex concepts when Hamlin did not understand them.

In a later report, Brumfield indicated that he had given Hamlin an IQ test on which he scored a 62 on the Full Scale Intelligence Scale. This later report also indicated that Hamlin's score on the CAST-MR assessment had declined in some areas, but improved in others. The aggregate scores still indicated that Hamlin was competent.

At the request of Brumfield, an additional expert from the Idaho Department of Health and Welfare, Dr. Susan Stumph, evaluated Hamlin. She also administered the CAST-MR test and Hamlin's scores continued to show he was competent. She opined that Hamlin was competent but might benefit from supportive efforts or accommodations.

Hamlin's counsel had an additional evaluation performed by Dr. Dave Sanford. Dr. Sanford noted that Hamlin had very limited abstract reasoning skill, limited knowledge of current events, and some memory limitations. He also administered a formal assessment, the MacArthur Competency Assessment Tool - Criminal Adjudication (MacCAT-CA). Dr. Sanford also used the Rorschach Inkblot Test. In his opinion, these assessments indicated that Hamlin was not competent. In preparation for an evidentiary hearing, Dr. Sanford submitted a second

3

report with substantially similar results. Dr. Sanford opined that "Because of Mr. Hamlin's limited capabilities it would be extremely difficult if not impossible for him to provide adequate assistance to counsel and follow court proceedings knowledgably."

On January 28, 2011, the magistrate court held an evidentiary hearing at which Brumfield, Dr. Stumph, and Dr. Sanford testified. Brumfield reported that Hamlin was able to engage in numerous activities that demonstrated some level of competence. For example, he had obtained a driver's license, had purchased a vehicle, and had maintained and paid for the trailer he and his wife lived in. Dr. Sanford testified that Hamlin had very limited abstract reasoning skills, a limited ability to read, and other cognitive deficits. As to the issue at bar, Dr. Stumph and Brumfield opined that Hamlin was competent to stand trial and Dr. Sanford opined he was not.

The experts' disagreement largely focused on which of the employed assessment instruments was the proper measure of competency. Brumfield argued that the CAST-MR was the proper assessment because it was designed for use with mentally retarded adults and had been validated for that use. He opined that the MacCAT-CA test was not indicated for use with mentally retarded adults, but was designed to be used with adults with psychiatric illnesses. Brumfield was asked if the improvement of Hamlin's score on the CAST-MR test was due to chance or due to being repeatedly asked the same multiple choice questions, and Brumfield indicated he did not believe that repetition was the cause of the improvement. Dr. Sanford disagreed; he believed that the MacCAT-CA test was the more appropriate test because it closely mirrored real court proceedings. However, on cross-examination, he admitted that the test had not been validated with respect to mentally retarded adults. In addition, some of Dr. Sanford's responses on cross-examination showed that Hamlin's score on the MacCAT-CA was low because the assessment requires specific answers to open ended questions, because it uses questions that require abstract reasoning through comparing oneself to a hypothetical person, and because it does not permit the evaluator to follow up on responses. Dr. Sanford also admitted he was not particularly familiar with the literature pertaining to the CAST-MR though he did have access to the instrument. Finally, Dr. Sanford acknowledged that competency determinations were not a significant portion of his practice.

In an oral ruling, the magistrate court said it gave more weight to Hamlin's scores on the CAST-MR than to his scores on the MacCAT-CA, finding that the former was "the accepted

instrument in this circumstance." The court also indicated that it would ensure the trial proceedings were properly managed to minimize the effects of Hamlin's disability. The Court instructed that the parties were to be patient and to "do their best . . . to use terms that are simple to understand and to be prepared to take recesses as necessary to ensure that the Defendant understands the proceedings." Thereafter, the court found that Hamlin was competent to stand trial and after additional proceedings, bound Hamlin over to the district court.

In the district court, Hamlin moved for another competency evaluation, and the district court appointed Dr. Sombke to reevaluate Hamlin for competency. Once again, the CAST-MR test was administered and it indicated Hamlin was competent. A second formal assessment was given, the Georgia Court Competency Test - Revised (GCCT-R). Hamlin's score on that test similarly demonstrated competency. Dr. Sombke noted that Hamlin might have difficulties testifying because he "is easily confused by questions and he tends to answer questions even though he does not know what he is being asked." For example, when asked if his crime was serious, Hamlin indicated it was not. When asked if what he was accused of doing was bad, he indicated that it was. This discrepancy resulted from Hamlin not knowing the meaning of the term "serious." Hamlin did understand that he faced the possibility of significant prison sentence, understood the role of various court personnel, and could explain the plea bargain process. Dr. Sombke opined that Hamlin was "marginally competent" but was limited "in his ability to testify in his own defense." In another portion of his written opinion, Dr. Sombke indicated that Hamlin lacked "the capacity to testify in his own defense."

On the basis of this report, Hamlin filed a motion to dismiss, asserting that he was not competent to stand trial. The district court found that Hamlin was still competent. It acknowledged that Hamlin presented evidence that he might not be a sophisticated witness, but concluded that Hamlin's limitations as a witness did not render him incompetent to stand trial. The court said that "[w]hether the Defendant would be as sophisticated a witness as some may wish is not determinative." After this ruling, Hamlin entered his conditional guilty plea.

Idaho Code § 18-210 provides that "[n]o person who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted, sentenced or punished for the commission of an offense so long as such incapacity endures." The standard for competence is whether "the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and

has 'a rational as well as factual understanding of the proceedings against him.'" *Godinez v. Moran*, 509 U.S. 389, 396 (1993) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)); *accord State v. Green*, 130 Idaho 503, 505, 943 P.2d 929, 931 (1997); *see also Indiana v. Edwards*, 554 U.S. 164, 170 (2008).

When a defendant's fitness to be tried has been contested in the trial court, we examine the record to determine whether there was sufficient, competent, although conflicting, evidence for the district court to find that the defendant had the capacity to stand trial. *State v. Daniel*, 127 Idaho 801, 803, 907 P.2d 119, 121 (Ct. App. 1995); *State v. Potter*, 109 Idaho 967, 970, 712 P.2d 668, 671 (Ct. App. 1985). We affirm the decision of the district court unless it is clearly erroneous.

The present case is similar to *Daniel*, where the defendant was mildly mentally retarded, with an IQ of approximately 63-64. One expert testified that the defendant was not competent to stand trial, and a second testified that the defendant has some limitations relevant to his ability to assist in his own defense. For example, the second expert stated, "[D]uring court proceedings, if information is presented too quickly or too abstractly, he will have difficulty understanding and grasping the material. Similarly, if the proceedings move too quickly, he may have difficulty communicating points to his attorney." *Id*. at 803, 907 P.2d at 121. The second expert nonetheless opined that the defendant was competent to stand trial. The district court, relying upon the second expert's opinion, found that the defendant was competent. We affirmed that decision on appeal.

For the same reasons that we affirmed in *Daniel*, we affirm the competency determination here. Our scope of review is narrow and deferential to the determination made below. Because the district court could consider not only Dr. Sombke's opinion but the opinions of the other experts who had evaluated Hamlin, the court was presented with conflicting expert opinions, and even Dr. Sombke did not consistently maintain that Hamlin would be entirely unable to testify. While Dr. Sanford opined that Hamlin was not competent, that opinion was based, in large part, upon a challenged assessment instrument. As in *Daniel*, there were legitimate concerns that the defendant's disability might make certain portions of the trial process more difficult; but, as in *Daniel*, the mere existence of some limitations does not render a defendant incompetent. Accordingly, we hold that there was sufficient, competent, although

6

conflicting, evidence for the district court to find that Hamlin had the mental capacity to stand trial.

**B.      Custodial Interrogation**

After police received a report that Hamlin had engaged in sex with, and had taken economic advantage of, a mentally retarded man with psychiatric disabilities, they asked Hamlin to come to the station for an interview. Hamlin arrived with his wife. Hamlin met with an officer in an interview room, and the interview was recorded. The officer, who was not in uniform but wore a police department polo shirt, did not formally take Hamlin into custody or handcuff him. He read *Miranda* warnings to Hamlin and asked Hamlin to initial and sign a waiver form. During the interview, Hamlin admitted to sexual contact with the victim. After making these admissions, Hamlin was arrested.

Hamlin filed a suppression motion, arguing that his statements should be excluded because he was subjected to custodial interrogation and did not intelligently waive his rights under *Miranda*. The district court held that *Miranda* did not apply because Hamlin was not in custody. Hamlin disputes this determination.

A waiver of the rights enunciated in *Miranda* will be effective only if it was made knowingly, voluntarily, and intelligently. *Maryland v. Shatzer*, 559 U.S. 98, 104 (2010); *State v. Doe*, 131 Idaho 709, 712, 963 P.2d 392, 395 (Ct. App. 1998). *Miranda* rights do not arise, however, and therefore need not be waived before police questioning can proceed, unless the interviewee is subjected to custodial interrogation. *Miranda*, 384 U.S. 436; *State v. Medrano*, 123 Idaho 114, 117, 844 P.2d 1364, 1367 (Ct. App. 1992). "Custody" refers to a situation where a person's freedom of action is curtailed to a degree associated with formal arrest. *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984); *State v. Myers*, 118 Idaho 608, 610, 798 P.2d 453, 455 (Ct. App. 1990). The "initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994). To determine whether a suspect is in custody, the relevant inquiry is how a reasonable person in the suspect's position would have understood his or her situation. *Berkemer*, 468 U.S. at 442; *Myers*, 118 Idaho at 611, 798 P.2d at 456. The United States Supreme Court has stated that relevant factors include the following: "the location, timing, and length of the interview, the nature and tone of the questioning, whether the defendant came to the place of questioning voluntarily, the use of

physical contact or physical restraint, and the demeanor of all of the key players, both during the interview and in any proceedings held in court." *Thompson v. Keohane*, 516 U.S. 99, 118 (1995).

Here, the district court determined that Hamlin was not in custody because he voluntarily came to the police station, the interview was not prolonged, Hamlin was not restrained, and Hamlin was not deprived of food, sleep, or water. Hamlin does not challenge these findings. He argues, however, that the district court should have found that he was in custody because the police initiated the meeting, the officers never told Hamlin he was free to leave, and an officer read Hamlin his *Miranda* rights, which was not required if the interview was not custodial. We consider each of these contentions in turn.

The first factor Hamlin cites is inconsequential, for virtually all investigative interviews, whether in or out of custody, are initiated by the police. That the police scheduled or arranged or requested an interview has little or no bearing on the question whether the resulting interview was custodial. *See, e.g.*, *Oregon v. Mathiason*, 429 U.S. 492, 493-94 (1977) (holding where the officer had left a note asking to speak with defendant, defendant had responded, and the officer had scheduled the meeting at the police station, the Court determined that the interrogation was not custodial). The second factor, the absence of an express statement that Hamlin was free to leave, is relevant to the inquiry but does not transform an otherwise voluntary interview into a custodial interrogation. *See State v. Osborne*, 130 Idaho 365, 369, 941 P.2d 337, 341 (Ct. App. 1997) (where interviewing officer "never stated that [the defendant] could not leave").

The last factor that Hamlin contends demonstrates that he was in custody is the fact that *Miranda* warnings were read to him. The presence or absence of *Miranda* warnings is not a factor that has been identified by the United States Supreme Court as relevant to the custody question. Although the federal authorities are not uniform regarding the import of the administration of *Miranda* warnings in an otherwise noncustodial interview, most hold either that the *Miranda* warnings are irrelevant to the nature of the interrogation or hold that it is merely one factor to be considered in the custody determination. *United States v. Harris*, 221 F.3d 1048, 1051 (8th Cir. 2000) (collecting cases concerning the impact of giving unnecessary *Miranda* warnings); *United States v. Bautista*, 145 F.3d 1140, 1148-1151 (10th Cir. 1998) (holding that giving *Miranda* warnings does not, of itself, convert an otherwise noncustodial interview into a custodial interrogation, but is a factor to be considered by the court); *Sprosty v.*

*Buchler*, 79 F.3d 635, 642 (7th Cir. 1996) (holding the warning is relevant but not dispositive to custody); *Davis v. Allsbrooks*, 778 F.2d 168, 172 (4th Cir. 1985) (rejecting the argument that giving unnecessary *Miranda* warnings automatically renders an encounter custodial); *United States v. Charles*, 738 F.2d 686, 693 n.6 (5th Cir. 1984) (rejecting the view "that the giving of *Miranda* warnings is evidence that the person questioned is under formal arrest or restraint of freedom of movement of the degree associated with formal arrest"), *overruled on unrelated grounds by United States v. Crawford*, 52 F.3d 1303, 1307 n.4 (5th Cir. 1995); *United States v. Lewis*, 556 F.2d 446, 449 (6th Cir. 1977) (rejecting the argument that "the very giving of *Miranda* rights helped produce a custodial interrogation"). We conclude that if the administration of *Miranda* warnings is relevant at all in determining whether an interview was custodial, it is a factor of little weight when considering the totality of the circumstances as directed by the Supreme Court in *Thompson*. To hold that the reading of *Miranda* warnings is a heavy indicator that the interviewee was in custody would give officers a disincentive to provide warnings that will be of benefit to interviewees regardless of their custodial status. The use of *Miranda* warnings should be encouraged, not deterred, as they both benefit interviewees and protect law enforcement from later allegations of *Miranda* violations.

We thus conclude that Hamlin has shown no error in the district court's determination that, considering "all of the circumstances surrounding the interrogation," *Stansbury*, 511 U.S. at 322, a reasonable person in Hamlin's position would not have believed himself to be in custody during the course of the interview.[2] Therefore, Hamlin's suppression motion was properly denied.

## C.  Other Constitutional Claims

Hamlin also argues that I.C. § 18-1505B unconstitutionally criminalizes sexual relations with mentally retarded people. The United States Supreme Court has held that the Due Process Clause of the United States Constitution precludes criminalizing private, consensual sex between adults. *Lawrence v. Texas*, 539 U.S. 558, 578 (2003). Such conduct falls within "a realm of personal liberty which the government may not enter." *Id.* (quoting *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 847 (1992)). However, *Lawrence* makes clear that this

---

[2]  In addition to the facts relied upon by the district court, we note that nature and tone of questioning was not overbearing and that the officer was courteous to Hamlin throughout the interview.

constitutional protection does not apply to nonconsensual sexual acts, including sex with those incapable of consenting. *Lawrence*, 539 U.S. at 578 (distinguishing sex with minors, sex with nonconsenting partners, and public sex from constitutionally-protected conduct). Hamlin appears to concede that a law which criminalizes sex with persons who are unable to consent to sex would be constitutional but argues that I.C. § 18-1505B is unconstitutional because it prohibits even consensual sexual relations.

Section 18-1505B prohibits "any lewd or lascivious act or acts upon or with the body or any part or member thereof of a vulnerable adult" when done "with the intent of arousing, appealing to or gratifying the lust, passion or sexual desires of such person, a vulnerable adult or a third party." A vulnerable adult is defined as

> a person eighteen (18) years of age or older who is unable to protect himself from abuse, neglect or exploitation due to physical or mental impairment which affects the person's judgment or behavior to the extent that he lacks sufficient understanding or capacity to make or communicate or implement decisions regarding his person, funds, property or resources.

I.C. § 18-1505(4)(e).

Hamlin correctly argues that this statutory definition of a "vulnerable adult" is not coextensive with the class of adults who are incapable of consenting to sex. For example, a mental disability that makes an individual incapable of managing his finances may cause him to fall within the statutory definition of a vulnerable adult, but also might not render him incapable of consenting to sex. Disabilities that gravely influence one sphere of a person's life may not limit a person in another sphere. Consequently, legal determinations of capacity and competency do not rely upon sweeping generalizations. *See In re Estate of Conway*, 152 Idaho 933, 943, 277 P.3d 380, 390 (2012) (drawing a "distinction between the tests for incapacity for guardianship purposes and testamentary capacity"); *McPheters v. Hapke*, 94 Idaho 744, 746, 497 P.2d 1045, 1047 (1972) (rejecting an argument that a court's determination of competency to make a will and competency to enter into contract should be subject to the same test). Thus, legal determinations of competency and capacity are fine-tuned and require proof of facts analytically related to the individual's *relevant* abilities or inabilities. *See, e.g.*, *State v. Griffith*, 144 Idaho 356, 362, 161 P.3d 675, 681 (Ct. App. 2007) (holding a witness is presumed competent unless a court determines the potential witness is incapable of receiving just impressions of the facts respecting which they are examined, or of relating them truthfully); *Knowlton v. Mudd*, 116

Idaho 262, 264, 775 P.2d 154, 156 (Ct. App. 1989) (holding a person is competent to contract when the person "possesses sufficient mind to reasonably understand the nature, extent, character, and effect of the act or transaction in which he or she is engaged"); *In re Stibor's Estate*, 96 Idaho 162, 164-65, 525 P.2d 357, 359-60 (1974) (holding that generally, in order to make a valid will, the testator must "have sufficient mentality to enable him to know what property he possesses and of which he is making a testamentary disposition, to consider and know who are the natural objects of his bounty, and to understand what the disposition is that he is making of his property by his will"). In short, a person deemed to lack capacity in one area of functioning will not necessarily lack capacity in other areas. Thus, not all "vulnerable adults" or, as is relevant here, all mentally retarded adults, are incapable of validly consenting to sexual behavior.

To the extent that any particular individual who is a "vulnerable adult" for some purposes is nevertheless capable of consenting to sex and does consent to sex in a private place, that conduct is protected by the Due Process Clause and may not be criminalized. *Lawrence*, 539 U.S. at 578. We addressed a somewhat similar circumstance in *State v. Cook*, 146 Idaho 261, 262, 192 P.3d 1085, 1086 (Ct. App. 2008). The defendant there was charged with performing fellatio on a male adult with Down's Syndrome in violation of I.C. § 18-6605, which imposes criminal penalties for committing "the infamous crime against nature." We there recognized the United States Supreme Court's determination in *Lawrence* that the Due Process Clause prohibits criminal charges against adults privately and consensually engaging in such activity, but also noted that *Lawrence* "does not affect a state's legitimate interest and indeed, duty, to interpose when consent is in doubt." *Cook*, 146 Idaho at 262, 192 P.3d at 1086 (quoting *Anderson v. Morrow*, 371 F.3d 1027, 1033 (9th Cir. 2004)). We noted that a defendant may raise an "as applied" challenge to the statute if it is demonstrated that the law, when applied to the defendant's conduct, is unconstitutional. *Cook*, 146 Idaho at 262, 192 P.3d at 1086. We also noted the difficulty of prevailing on such a challenge through a pretrial motion to dismiss as "it is often difficult to ascertain what [the] facts are without the benefit of a trial." *Id*. at 263, 192 P.3d at 1087.

Here, Hamlin did not and could not demonstrate, on a pretrial motion to dismiss the charge, that the statute violated due process as applied to him because, although Hamlin contended that his sexual contact with the victim was consensual, the State alleged and was

prepared to present evidence that the victim was incapable of consent. According to his mental health care providers, the victim was substantially mentally disabled with significant psychiatric infirmities in addition to mental retardation. He required an array of support services to maintain a safe and hygienic lifestyle. It is apparent that the question whether the victim was capable of consenting to sexual contact with Hamlin is a factual issue that could not properly be resolved short of trial. *See State v. Alley*, 155 Idaho 972, 980-81, 318 P.3d 962, 970-71 (Ct. App. 2014). Therefore, the district court correctly denied Hamlin's motion to dismiss based on his as-applied challenge to the statute.

To the extent that Hamlin is contending that the statute violates equal protection by prohibiting him from engaging in sex with "vulnerable adults" because Hamlin himself is mentally retarded, he presents an improperly framed equal protection claim. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "Equal protection issues focus on classifications within statutory schemes that allocate benefits or burdens differently among the categories of persons affected." *In re Bermudes*, 141 Idaho 157, 160, 106 P.3d 1123, 1126 (2005); *see also State, Dep't of Health & Welfare ex rel. Martz v. Reid*, 124 Idaho 908, 911, 865 P.2d 999, 1002 (Ct. App. 1993). "Equal protection claims require a three-step analysis: the reviewing court must first, identify the classification that is being challenged; second, determine the standard under which the classification will be judicially reviewed; and third, decide whether the appropriate standard has been satisfied." *Bermudes*, 141 Idaho at 160, 106 P.3d at 1126; *see also State v. Mowrey*, 134 Idaho 751, 754, 9 P.3d 1217, 1220 (2000); *Coghlan v. Beta Theta Pi Fraternity*, 133 Idaho 388, 395, 987 P.2d 300, 307 (1999).

Therefore, in order for Hamlin to prevail, he would be required to show that he, by virtue of some classification, is being treated differently than a person who does not share that classification. Section 18-1505B creates no such classification. By its express terms, the statute prohibits "any person" from sexually abusing and exploiting a vulnerable adult. That is, both mentally retarded persons and persons who are not mentally retarded are prohibited from sexual contact with a vulnerable adult. Accordingly, Hamlin cannot legitimately assert that the State is treating him differently on account of any classification. Hamlin is not requesting that we

12

invalidate a law that treats him unfairly on the basis of some classification; he is requesting preferential treatment. That is not a cognizable equal protection claim.

## III.

## CONCLUSION

The district court did not err by finding that Hamlin was competent to stand trial or by denying Hamlin's motion to suppress his confession. While Hamlin correctly argues that the statute under which he was prosecuted is susceptible to an as-applied challenge asserting a due process right to personal liberty and privacy in consensual sexual relations, he has not shown that his victim was capable of consenting to sex. Accordingly, the district court correctly denied Hamlin's motion to dismiss the charge. No error having been shown, the judgment of conviction is affirmed.

Chief Judge GUTIERREZ and Judge MELANSON **CONCUR.**